[No. 193.   Decided June 4, 1891.]

## The Oregon Railway and Navigation Company v. John Egley and Hattie Egley.

RAILROADS — NEGLIGENCE — INJURIES TO CHILD — CONTRIBUTORY NEGLIGENCE.

Where a boy, nine and one-half years of age, is injured while stealing a ride upon the foot-board of a switch engine, the facts that he is of ordinary intelligence, familiar with the workings of a switch engine, and aware of the danger of his act, that he has frequently been forbidden by his parents from going upon the cars, and has been driven away from them by the employés of the railroad, are sufficient to establish contributory negligence on his part.

It is not negligence on the part of a railroad company for its employés to fail to ascertain that a boy of tender years is stealing a ride, unknown to them and out of their sight, on the back foot-board of a switch engine, when they have made a practice of preventing such acts by driving boys away when they saw them about the cars.

*Appeal from Superior Court, Walla Walla County.*

The facts are fully stated in the opinion of the court.

*W. W. Cotton, W. B. Gilbert,* and *C. B. Upton,* for appellant.

*Brents & Clark,* for appellees.

The opinion of the court was delivered by

Dunbar, J.—The undisputed facts in this case are that Zene Egley, on the 3d day of May, 1889, was run over by the switch engine of the defendant, in the city of Walla Walla, and as the result thereof his right leg was so crushed that afterwards it was amputated about four inches below the knee joint. This action is brought by the plaintiffs against the defendant for the injury to the said Zene Egley, the child of the plaintiffs. The plaintiffs, as will be seen by reference to the pleadings, alleged that this injury was caused by the defendant in wrongfully inviting, inducing

and permitting said child to be and go upon the said en-
gine, and' thereafter carelessly running and operating the
same while the child was thereon, exposed to great danger.
The defendant in its answer denied these allegations, and
set up the defense of contributory negligence.   Other mat-
ters in relation to the ownership of the road were contested
at the trial below, but were abandoned by the appellant here.

The fourth special finding of the jury was entirely un-
warranted and unsupported by the testimony.   In response
to the question, "Did the said Zene Egley know that it
was dangerous for him to ride upon the engine and freight
cars of the railway mentioned in the complaint, in the
manner in which it has been shown by the evidence he was
doing at the time he was injured?" jury answer, "No."
There is no evidence tending to prove this finding.   The
whole testimony shows that Zene Egley was a boy of ordi-
nary understanding, capable of comprehending and act-
ing upon what was told him.   It appears from the testimony
of all parties (including the testimony of the boy himself)
that he had been warned time and time again, not only by
his parents, but by the servants of the company and his
associates, not to attempt to ride on the cars.   His own
father testified as follows:

"Well, I often told him not to ride upon the cars; not to
go near them.   I cautioned him in this respect."

It is not too much to say that the jury ought to have
understood from the expression, "I cautioned him in this
respect," that the witness meant to say or did say, in effect,
"I warned him of the danger of riding on the cars."   The
boy himself testified that he was afraid he would get run
over by the cars.   On re-direct examination, commencing
on page 82 of the transcript, the following testimony was
given:

"Question by Mr. Brents: Zene, you stated yesterday
that you knew it was dangerous to be on that back end of

the tender. When did you first know that it was danger-ous—when did you first find out that it was dangerous? A. Before I got hurt—before.

"Q. Did you know it was dangerous before you got hurt? A. Yes."

This was direct and positive testimony by the boy in answer to direct questions by his own attorney, and was not in any way affected by the leading and misleading examination which immediately followed, which was as follows:

"Q. Did you know it after you got hurt? A. Yes, sir.

"Q. You knew it by getting hurt. A. Yes, sir.

"Q. Was that the first thing that caused you to know that it was dangerous? A. Yes, sir."

Cross-examination, which followed, was as follows:

"Q. Zene, didn't your father and mother tell you not to go upon the engine? A. Yes, sir.

"Q. Did they tell you why? A. Yes, sir.

"Q. When did they tell you not to get upon the engine? A. Before I got hurt.

"Q. Why did they tell you not to get upon the engine? A. Said I would get hurt.

"Q. Zene, have you ever been driven away from the cars at various times? A. Yes, sir.

"Q. Did the trainmen ever say anything to you? A. Yes, sir.

"Q. What did they say to you? A. Told me to get away.

"Q. Did they say they would do anything to you if you got on board? A. Yes, sir.

"Q. What did they say? A. Said they would punish me.

"Q. You knew it was dangerous to get on there, didn't you, before the accident? A. No, sir.

"Q. Hadn't you been told it was dangerous? A. No, sir.

"Q. Didn't your mother tell you it would hurt you? A. Yes, sir.

"Q. Didn't your father tell you it would hurt you?
A. Yes, sir.

"Q. Well, didn't you know it would hurt you? A.
Yes, sir.

"Q. And you knew this before the accident? A. Yes,
sir."

Thus it will be seen that while the boy testified that he
did not know it was dangerous, it is evident that he did
not definitely understand the meaning of the word "dangerous," for he testified in the next breath that his father
and mother told him it would hurt him, and that he knew
it would hurt him. It is too evident for discussion that
the testimony of the boy, outside of any other testimony,
shows conclusively that he *did* know it was dangerous for
him to ride upon the cars in the manner in which he was
riding when he was hurt, and that there was no conflict of
testimony on that subject worthy of the consideration of
the jury; and while it is true that a case will not be taken
from the jury when there is conflict of testimony, and that
a court will not be justified in disturbing a verdict because
its judgment may run counter to the judgment of the jury,
or because the weight of testimony is, in the opinion of the
court, opposed to the verdict, it is equally true that where
there is no conflict of testimony on material points, and
there is no testimony tending to establish a fact, the establishment of which is necessary to warrant a verdict, the
court will not hesitate to interfere in the interests of justice, and reverse the judgment.

In this case it is shown by the testimony that Zene Egley
was nine and a half years old. It is shown by the testimony, and not disputed, that he was a boy of ordinary intelligence and practical experience, and that he was familiar
with the workings of railroads, and especially with the
workings of the switch engine by which he was injured,
and that he had discretion enough to know that the amusement on which he was insisting, was amusement fraught

with danger, and that he was a trespasser on the railroad when he was stealing the rides. He may not have known the technical meaning of the word "trespass," but all the testimony, including his own, shows that he knew he had no right on the car; that not only had he been cautioned and forbidden by his parents to go upon the cars, but had been frequently driven away by the yard-master and other employés; and that they had threatened to punish him if he did not keep away; and shows that he knew he was a wrong-doer. See the following testimony:

"Q. Do you know the yard-master by sight?  A. Yes, sir.

"Q. Had he ever driven you off the cars?  A. Yes, sir.

"Q. How many times?  A. I don't know.

"Q. How many do you think?  A. About three times.

"Q. About how many?  A. Three; not more than three, though may be more.

"Q. Well, how many more?  A. I can't tell just how many times.

"Q. Well, how many do you think?  A. About five or six.

"Q. When you were on a car, and you saw him coming, what did you do?  A. Got down and run.

"Q. And you always did that, did you?  A. Yes, sir.

"Q. What would he do if he happened to get near you?  A. I don't know.

"Q. Did he ever tell you to stay off the cars?  A. Yes, sir.

"Q. Didn't he always tell you to stay off the cars when he got close enough to speak to you?  A. Yes, sir.

"Q. And every time he saw you he said that?  A. Yes, sir."

Add this to the testimony of the father that he had cautioned the boy not to go on the cars, and that at one time he prevented him from doing so; and that of the yard-master, Mr. Gould, that he had at one time stopped the train and put him off; and, to use his own language, "in two or three cases I gave him to understand I would

give him a thrashing when I got close to him, and he would get off a distance and begin to swear and abuse me, and call me names, some of them, and after that they kept clear of me and watched me pretty close;" and it plainly appears, without any doubt whatever, that the boy was of a mind sufficiently discriminating to know that he was trespassing, and to be responsible for contributory negligence.    Of course, I recognized the fact that a different gauge or measure must be used in ascertaining or determining the degree of guilty negligence to be imputed to a child, from that used in determining the degree of negligence to be imputed to an adult of ordinary intelligence. This is a distinction founded in justice, and the reasoning which sustains it cannot be gainsaid.    Neither do I question the proposition, stated by counsel for the plaintiff, that since the law does not, in any case, exact an unreasonable or impossible thing from any one, the duty thus devolved upon each depends upon his powers of comprehension and performance; and the duty of a child, therefore, is proportionate to its mental and physical capacity.    But, strictly applying the principles of that proposition to the facts of this case, as shown by undisputed testimony, the conclusion above is reached.    The law, as laid down by Shearman and Redfield on the Law of Negligence (volume 1, § 73), is as follows:

"It is now settled by the overwhelming weight of authority that a child is held, so far as he is personally concerned, only to the exercise of such degree of care and discretion as is reasonably to be expected from children of his age.    No injustice is done to the defendant by this limitation of the defense of contributory negligence, since the rule itself is not established primarily for his benefit, and he can never be made liable if he has not been himself in fault.    Thus, where one is driving a horse with ordinary care, at a rate of speed suited to the locality, he is, of course, not liable for an injury by the horse to a child who suddenly throws itself in the way, and is run over before the driver

can prevent it. So, if a child, proceeding in reckless haste, however natural to its age, should rush against a railroad car while in motion, the driver of the car or engineer of the train not seeing him, it is obvious that his act is the sole cause of his injury; and, even though he may be entirely free from blame, the most that can be said in his favor is, that the case is one of inevitable accident; and the owner of the car is no more responsible for his injury than would have been the owner of a wall against which the child had thoughtlessly struck himself."

The contributory negligence in this case being proven by undisputed testimony, the next question is, was there any negligence on the part of the railroad company which was the approximate cause of the injury? or, to state it negatively, could the injury have been prevented by any degree of care which the law imposed upon the railroad company? The testimony, in my judgment, shows no negligence at all on the part of the company. Whenever they saw boys about the cars, they immediately drove them off, and threatened to punish them. It appears from the testimony that the company had issued a bulletin not to allow boys on the track, and that its servants did all they could reasonably be called upon to do to carry out the instructions of the company in this respect; and it was well understood by the boys in that neighborhood generally, and by Zene especially, that they had no right to go into or about the cars. He slipped on the engine with a view of hiding himself from the engineer, and located himself on the footboard at the back end of the engine, where the engineer could not see him while attending to his duties. It is not claimed that any employés of the company saw him there or had any knowledge of his whereabouts.

"Negligence," says Shearman and Redfield, "includes two questions: (1) Whether a particular act has been performed or omitted; and (2) whether the performance or omission of this act was a breach of a legal duty. The

first of these is a pure question of fact; the second is a pure question of law." § 52. As was said by the supreme court of Connecticut in the case of *Nolan v. Railroad Co.*, 53 Conn. 461 (4 Atl. Rep. 106):

"'Negligence' may be defined to be a failure to perform some act required by law, or the doing of the act in an improper manner. The law determines the duty; the evidence shows whether the duty was performed. The duty resting upon the defendant was a question of law; was the duty performed? was a question of fact."

These authorities, I think, fairly present the law, and the relative duties of the court and the jury, on this perplexing question. The theory of the plaintiff in this case is, that the company was negligent in not ascertaining that the boy was on the engine at the time of the accident, and this seems to be all the negligence attributed to it; and it is evident, from the special findings and the verdict, that this view was taken by the jury, and it becomes the duty of this court to announce that the omission of the act complained of does not constitute legal negligence. As wide a range as the decisions of courts have taken on this interesting subject, no court, to my knowledge, has gone so far as to hold that railroad companies are the absolute insurers of the life and limbs of boys who, against their express commands, insist upon trespassing upon their property; and to sustain this case would, in my opinion, go that far. The only way the company could prevent this would be to keep a sufficient number of guards to detect boys in their attempts to board the cars or engines. If the presence of the boy on the engine or cars had been brought to the knowledge of the operators of the engine, it is plain that their duty would have been to have protected him from harm, no matter how great his negligence might have been. The testimony shows that they did not see the boy on the engine, and did not know that he was there; for, by reason

of his location on the foot-board of the engine, the engineer, in the performance of his ordinary duties, could not have seen him. The verdict is wholly unsustained by the evidence, and strictly, the defendant would probably be entitled to judgment on the third and fifth special findings; but, as the jury was evidently influenced both as to their general verdict and special findings by the instructions of the court, which in their general scope, and especially in the seventeenth instruction, went to the extent that the defendant should have exercised care in ascertaining whether or not Zene Egley was on said engine immediately preceding said injury, the judgment will be reversed, and the cause remanded to the lower court, with instructions to retry the case, and to modify the instructions in accordance with this opinion.

SCOTT, HOYT, and STILES, JJ., concur.

ANDERS, C. J., not sitting.