Gourley et ux. *v.* Pittsburgh, Appellant.

Argued October 1, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

 reargument refused November 27, 1945.

*H. Stewart Dunn,* Assistant City Solicitor, with him *Anne X. Alpern,* City Solicitor, for appellant.

*A. M. Oliver,* with him *W. J. Connelly,* for appellees.

OPINION BY MR. JUSTICE DREW, October 30, 1945:

These suits in trespass against the City of Pittsburgh were brought by Patrick Gourley and his wife, in their

own right, and by Patrick Gourley, Administrator of the Estate of William Anthony Gourley, deceased, to recover damages resulting from the death of their minor son, William Anthony Gourley. The cases were consolidated and tried together; verdicts were rendered for plaintiffs; and after motions of defendant for judgment n. o. v. and a new trial were refused, and judgments entered upon the verdicts, the City took these appeals, alleging as error the refusal of its motions.

As we are required to do, in passing upon defendant's motion for judgment n. o. v., we shall read the testimony in the light most advantageous to plaintiffs, resolve all conflicts in their favor, and give them the benefit of every fact and inference of fact pertaining to the issues involved, which may reasonably be deduced from the evidence: *Muehlhof v. Reading Co.*, 309 Pa. 17, 162 A. 827.

Applying this rule the verdicts must be taken as having established the following facts: On January 20, 1943, William Anthony Gourley, aged thirteen, son of plaintiffs, Patrick and Rose Gourley, was killed by being buried under a slide of slag on defendant's property, in Heth's Run Hollow, Pittsburgh. The part of the hollow involved in this accident is situate at the foot of Highland Park, a short distance from the tracks of the Pennsylvania Railroad Company and the Allegheny River, and close by the Allegheny River Boulevard and Butler Street.

For a long time prior to this accident the City of Pittsburgh was the owner of the property known as Heth's Run Hollow, which extends from the Allegheny River almost two miles to Bryant Street. Since 1939, the City has constructed a large combination and storm sewer through the hollow to permit the filling of the ravine and not obstruct the flow of storm water out of the ravine. At a distance beginning at the tracks of the Pennsylvania Railroad and running south, there has been dumped at the bottom of the hollow a considerable

quantity of incinerator ash hauled from the incinerator plant of the City. At the same time, the City dumped large quantities of slag at various points in the hollow. There were four dumps of slag at different points; the one in which we are interested was located at the easterly end of the hollow near the Heth's Run Bridge. In April 1942, the City arranged to have granulated blast furnace slag from the Isabella Furnace, at Etna, dumped over the floor of the hollow to cover the sewer and the incinerator ash. This was continued for about four months and about 25,000 tons of slag were dumped from trucks and deposited on the side or slope of the hollow so that it would slide down into the bottom. This slag was dumped there as a matter of storage of the material, and later the City with its own employees and City equipment, worked on the toe or base of the slag dump, and by means of a power shovel, a grader and a bulldozer, spread the slag over the floor of the hollow as a blanket over the sewer. By this filling the contour of the hollow was entirely changed, its grade being raised twenty or thirty feet.

Heth's Run Hollow is an open hollow with steep sides, a descent of about 250 feet. It was extremely hard of access because anyone entering the hollow from either the east or the west side was required to climb down over very rough, steep banks covered with bushes and small trees. Such a climb was dangerous and hazardous, and only adventurous boys attempted it. Prior to the accident, in order to facilitate access to the hollow the City had constructed down its west side a roadway, to enable its trucks to haul the incinerator ash down to the bottom of the hollow. This road played no part in the accident. It could have been used as a safe access but it was not.

On the day of the accident the City was continuing its work of filling the hollow with both incinerator ash and slag and spreading it over the bottom. The testimony of plaintiffs' witnesses, including the only eye-

witnesses to the accident, was that William Anthony Gourley and seven other boys, aged from thirteen to fifteen years, had gone into the hollow to play. They did not enter by the road, but as done before, had crossed through the gasoline station of Frank Durzo, on Butler Street, jumped over the three-foot fence in the rear of his property, and gone down the steep and dangerous side of the ravine to the bottom of the hollow.

The testimony of the boys is that immediately prior to the accident they were playing a game, in which they divided into two sides, four of the boys played on the top of a pile of slag which stood in the middle of the hollow and the other four boys played near the base of the slag pile on the easterly side of the hollow. Their testimony is that they had been playing there from about one-thirty in the afternoon until two-thirty or three; that they then sat down to rest; that three or four boys were sitting in a group with William Gourley, who sat with his back to the slag pile at a distance of about four feet from its base; that the other boys were seated facing the slag pile; and that of a sudden one of the boys facing the slag pile saw it moving and shouted: "Look out". All the boys, including William Gourley, started to run, and all escaped but him. He alone was caught. He fell forward and the slag covered him. At the time of the accident, and for some hours before, there were no employees of the City on the scene, they having quit work earlier that day. All the boys appeared as witnesses for the plaintiffs. They uniformly admitted that they had played in the hollow, usually after school, always entering by going over the fence at Durzo's gas station and down the steep hill. Some admitted they had gone down, over the slag dump, slid down, but denied doing it that day. They all said they had not seen the Gourley boy go on the dump. It was said that "about a dozen children played there twice a week". That witness, Robert Elbell, aged fifteen, said he had played there the week before the accident. The boys generally said they had played in the

hollow, and seen others do so for years, but even more generally they failed to say this was done with any degree of frequency. Their testimony on this point was at least indefinite and unsatisfactory. Several residents of the neighborhood said they had seen boys playing there. There was no mention of any girls ever having played there or of any other small group of boys doing so.

Durzo, who operated for years a gasoline station almost on the scene of the accident, said very definitely the hollow was not a playground and that he had never seen any boys playing at the base of the slag pile. The City did not deny that frequently men and women and children walked along the road through the hollow, but denied there was a playground there. The dumping and spreading of the slag was done entirely within the limits of City-owned property. There is not a word of proof that the City had any actual notice of the presence of the boys on its property, the claim being that because of long usage the City had constructive notice, and that in fact and law a permissive playground existed at the base of the slag pile, whether the City actually knew it or not. It is admitted if no playground existed the boys were trespassers on City property, and the only duty of the City was to refrain from inflicting upon them willful or wanton injury: *Dumanski v. City of Erie,* 348 Pa. 505, 34 A. 2d 508. There is no thought that this accident was caused by any willful or wanton conduct of the City.

An owner is not bound to keep his premises in a suitable condition, and, as against trespassers, he need not take any of the ordinary precautions to safeguard places on his property. We said in *Fitzpatrick v. Penfield,* 267 Pa. 564, 572, 109 A. 653: "Ordinarily, the tender age of a child cannot have the effect of raising a duty where none otherwise existed, and the rule throughout the United States is that the mere fact a trespasser is a child will not create or impose on the owner of a property any duty to keep his premises safe; especially is this true in this State, where the owner does not erect on his premises an attractive appliance, or permit the land to be used

as a playground for such length of time as to presuppose an invitation or permission to occupy the premises in this manner. When so used, ordinary care must be exercised to keep the premises in safe condition. Of course, this does not mean occasional or intermittent occupancy of another's ground by children as a playground—or almost every foot of open or fenced land, would be under the exception to the general rule, and the general rule would then be the exception. The amount of use that will bring otherwise private ground within the playground rule must depend to a large extent on the circumstances of each case. It may be said that the use contemplated is such as to cause the place to be generally known in the immediate vicinity as a recreation center, and its occupancy should be shown to be of such frequency as to impress it with the obligation of ordinary care on the part of the owner." *Prokop v. Becker*, 345 Pa. 607, 29 A. 2d 23; *Hogan v. Etna Concrete Block Co.*, 325 Pa. 49, 188 A. 763; *Riebel v. Land Title Bk. & Tr. Co.*, 143 Pa. Superior Ct. 136, 17 A. 2d 742.

We have read this record very carefully, and considered everything in the light most favorable to plaintiffs, but have not been able to discern any negligence on the part of the City of Pittsburgh. Plaintiffs attempted to prove that the base of the slag pile was a permissive playground, that it had been used by numerous boys as a playground for such a length of time as to amount to an invitation by the City to use it for such purpose, and that the City did not protect them by ordinary care. This they failed to do. There is no warrant in the testimony for such a conclusion. The most they showed was that the use of this place was by a small group of boys and such use was occasional and intermittent and not such "as to cause the place to be generally known in the immediate vicinity as a recreation center". In Highland Park, 425 acres, a recreation center for all Pittsburgh, adjoining the property in question, are organized playgrounds for children, with the most approved equipment.

Although the hollow adjoins a built-up section of the City, only a few residents of the neighborhood testified, and while they knew this place, their testimony was insufficient to show that the use of it as a playground was so general and of such frequency as to cause it to be known in the community as a playground. Plaintiffs having failed to make a case, the motion of the City for judgment n. o. v. should have been granted by the learned court below.

In this disposition of the case it is unnecessary to consider the question of governmental function, or the alleged contributory negligence of the boy and his parents.

Judgments reversed and now entered for defendant.