Scibelli, Appellant, *v.* Pennsylvania Railroad Company.

Argued May 24, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Arthur Berman,* with him *Samuel Handler* and *Compton, Handler & Berman,* for appellants.

*John McI. Smith,* with him *James H. Stewart, Jr., Wilhelm E. Shissler* and *Nauman, Smith, Shissler & Hall,* for appellee.

OPINION BY MR. JUSTICE CHIDSEY, September 27, 1954:

In this action of trespass the plaintiffs, Frank A. Scibelli, by his father and guardian, Joseph A. Scibelli, and Joseph A. Scibelli and Marion Scibelli in their own right, sought to recover damages for injuries sustained by the minor plaintiff when he attempted to steal a ride on the defendant's train. The jury returned a verdict in favor of the minor plaintiff for $14,500 and for his parents in the sum of $7,500. The defendant filed a motion for a new trial which was withdrawn and a motion for judgment non obstante veredicto which the court granted. Plaintiffs appeal from the entry of the judgment for defendant.

For a proper understanding of the issue involved it becomes essential to depict the locus in quo. The defendant, Pennsylvania Railroad Company, operated a single track spur line through the City of Lebanon, Pennsylvania between its yards at Twelfth Street and the plant of the Bethlehem Steel Company east of its yards. The tract of land where the accident occurred, colloquially termed "The Willows", is bounded on the east by Seventh Street, on the west by Eighth Street and on the south by Willow Street. A short distance west of and parallel to Seventh Street lies Chapel Street which leads into and comes to an end at Willow Street.

The Willows is an open area but there are residences and other buildings on both Eighth Street and Willow Street, the rear of which buildings face the open area. The Quittapahilla Creek flows in an east-west direction approximately in the center of The Willows. The defendant owned all of The Willows south of Quittapahilla Creek, and on January 16, 1951 leased all of this land with the exception of its spur line and right-of-way to parties known as Altenderfer and Mar-

got. North of the creek the defendant also owned land which its spur line traversed, although most of The Willows north of the track belonged to the Reading Company.

Tracing the spur line in the direction the train moved on June 25, 1951, the day of the accident, it proceeded westwardly parallel to Willow Street and as it crossed Chapel Street curved to the right into The Willows in a northwesterly direction. Proceeding on this course through The Willows it crossed a railroad bridge over the Quittapahilla Creek, continued in a northwesterly direction and then curved to the left to intersect Eighth Street. The track may be considered as constituting an elongated "S" with the western end at Eighth Street and the eastern end at Chapel Street where the latter intersects Willow Street, a distance of 762½ feet.

The testimony offered by the plaintiffs which must be interpreted most advantageously to them discloses that on June 25, 1951 the minor plaintiff, who was seven years of age, along with several other children, was playing in the vicinity of a group of mulberry trees which grow a short distance east of the spur line on the south side of the creek. At about 2 P.M. the defendant's train, consisting of eleven cars drawn by a diesel shifter engine, entered The Willows from the east, travelling about as fast "as a person could walk". The last three cars were empty low flat cars with built-up ends and no sides, commonly designated as billet cars. All five members of the crew were in the cab of the diesel engine. As the diesel passed the children they were on the south bank of the creek west of the track picking mulberries. Nellie Croesus, age 12, a cousin of the minor plaintiff, held onto his shirt as the locomotive went by and then thinking that the children would continue picking mulberries, she released him. After most

of the train passed the children, it came to a momentary stop near the Eighth Street intersection, with at least three of its cars on the same side of the creek as the children. With the train in this "S" formation, three of Frank Scibelli's playmates boarded one of the empty flat cars. Seeing this, Frank suddenly ran toward the train. Nellie Croesus shouted to him several times to keep away from the train. Frank testified that he heard someone calling "Come back, don't go near the train", but nevertheless, paying no heed to the warning, he attempted to board it. While he had his two hands on the ladder of one of the cars and his left foot on one of the rungs, the train jerked as a result of which Frank's left leg slipped under the wheel and was severely crushed, requiring amputation below the knee.

The theory upon which the plaintiffs principally relied to establish negligence was the so-called playground doctrine. The basis of liability in cases coming within that doctrine is that where an owner permits children to use his premises as a playground, a duty arises to exercise ordinary care in keeping the premises safe. In *Fitzpatrick v. Penfield,* 267 Pa. 564, 572, 109 A. 653, Mr. Justice KEPHART said: ". . . When so used, ordinary care must be exercised to keep the premises in safe condition. Of course, this does not mean occasional or intermittent occupancy of another's ground by children as a playground—or almost every foot of open or fenced land, would be under the exception to the general rule, and the general rule would then be the exception. The amount of use that will bring otherwise private ground within the playground rule must depend to a large extent on the circumstances of each case. It may be said that the use contemplated is such as to cause the place to be generally known in the immediate vicinity as a recreation center, and its occupancy should be shown to be of such frequency as to

impress it with the obligation of ordinary care on the part of the owner." See also *Rahe et al. v. Fidelity-Philadelphia Trust Company et al.,* 318 Pa. 376, 178 A. 467; *Gourley et ux. v. Pittsburgh,* 353 Pa. 112, 116, 44 A. 2d 270.

The playing of various games by children on the land adjoining the defendant's right-of-way was of sufficient frequency to bring it within the accepted definition of a playground. There was also some testimony, when viewed in a light most favorable to the plaintiffs, tending to establish that the tracks themselves formed a part of the playground. Mrs. Lillian Manz, who had lived for 18 years in a dwelling house overlooking The Willows, said that the children would see who could walk the rail the longest without falling off. William W. Uhrich, the janitor of a building overlooking the playground, testified that during the wintertime the children would take cinders and cover them with snow and slide over the tracks. Nellie Croesus, a participant in the alleged games, stated that the children did not exactly play on the tracks but used to run across them. Ralph Smith, who lived in the vicinity for three and a half years, testified that the children played around the railroad bridge and all along the railroad and to the east of the railroad.

However, even if the evidence be regarded as sufficient to show tacit assent by the defendant to the use of its tracks as part of the playground, the testimony will not support the claim that the defendant acquiesced in trespasses upon its trains. While there is some evidence that children had on occasions jumped on trains in the area of The Willows and had crossed over them when they were standing still for a period, the evidence was insufficient to establish this as a practice carried on with the knowledge and consent of the defendant. Considering the testimony most favorably to

the plaintiffs in this respect, the boarding of trains was occasional only and there was no acquiescence in such conduct. On the contrary crew members made efforts to keep children from the trains. There was no testimony of a single instance when a child had been permitted to board or "take a ride" on a train passing through the area. A witness for plaintiffs testified that he had seen crew members chase boys off the train "quite often", and from this counsel would have the inference drawn that there was an habitual practice of climbing or jumping on the trains. There was no amplification of this vague expression. Other witnesses testified that "sometimes" boys would attempt to board the trains. None of the witnesses could approximate the number or fix the times of such occurrences. The evidence was entirely too indefinite to establish the extent of such alleged practice or to supply the frequency and regularity required to bring it within the playground rule. Cf. *Prokop et ux. v. Becker et al.,* 345 Pa. 607, 29 A. 2d 23; *Riebel et al. v. Land Title Bank & Trust Co.,* 143 Pa. Superior Ct. 136, 17 A. 2d 742.

Thus while the testimony may have made the defendant chargeable with acquiescence in the use of the track as part of the children's playground, this is not true of the trains which were operated on the track. A necessary element of the playground doctrine is permission or acquiescence in the use of the owner's property. The presence of this element gives to the children the status of gratuitous licensees. The license, however, does not extend beyond the use to which the express or implied permission applies: See *Prokop et ux. v. Becker et al.,* supra, at p. 609; *Dumanski v. City of Erie,* 348 Pa. 505, 507, 34 A. 2d 508; Restatement, Torts, §341, comment b.

The case of *Gawronski v. McAdoo,* 266 Pa. 449, 109 A. 763, chiefly relied on by plaintiffs, is inapposite.

There an eight-year old boy was injured while on the top of a freight car standing with other cars in a railroad yard containing an open area which had been used constantly for years as a playground without objection by the railroad company. Baseball had been played thereon for many years and defendant's employes had frequently participated in the games. Freight cars which were left standing for some time were used by boys as grandstands to watch the ball games. For at least three-quarters of an hour before the accident the minor plaintiff and 14 other boys were seated on the freight car watching a ball game in full view of a number of defendant's employes. Thus there was implied if not express permission to use the cars which customarily remained standing on the tracks for a considerable period of time. The injured boy had been in full view of the employes. Obviously the circumstances which were controlling in that case do not exist in the instant case where a train in normal operation was stopped only momentarily and the 'presence of the minor plaintiff on the train was unknown to defendant's employes.

Counsel for the plaintiffs, however, insist that even if the train may not be considered a playground, the defendant owed a duty of care toward minor trespassers because it should have foreseen that children might attempt to board the train and taken measures to prevent such conduct. It is claimed that if one of the crewmen had been stationed toward the rear of the train, the accident could have been prevented.[1]

---

[1] It is stated in appellants' brief that on prior occasions when a train passed through the area a crewman was posted toward the rear of the train to warn or deter children from boarding it. The record does not support this assertion. The testimony showed that the trains operating on the spur line to and from the Bethlehem Steel plant consisted of a varying number of cars and would

Needless to say, the operation of its trains by a railroad company over its right-of-way for the transportation of freight is an essential function. It is vital to commerce, and the public as well as the railroad company has an interest therein. The maintenance of service should not be made unduly burdensome. We have been referred to no case where a court has gone so far as to require a railroad company to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them. On the contrary, other jurisdictions have held that no such duty exists: See *Smith v. Illinois Cent. R. Co.*, 214 Miss. 293, 313, 58 So. 2d 812, 819 (1952); *Union Ry. Co. v. Williams*, 6 Cir., 187 F. 2d 489, 493 (1951); *Nolley v. Chicago, M., St. P. & P. R. Co.*, 8 Cir., 183 F. 2d 566, 569, 570 (1950); *Angiline v. Norfolk & W. Ry. Co. et al.*, 99 W. Va. 85, 128 S.E. 275, 277 (1925); *Wilson v. Atchison, T. & S. F. Ry. Co.*, 66 Kan. 183, 186, 71 P. 282 (1903); *The Oregon Ry. and Nav. Co. v. Egley*, 2 Wash. 409, 26 P. 973 (1891). It is difficult to conceive how a proper operation of trains for the service of the public could be maintained if the standard of responsibility contended for received countenance.

In the present case the evidence adduced by the plaintiffs was conflicting as to which car of the train the minor plaintiff attempted to board and the plaintiffs' testimony showed that the sporadic attempts to board a train occurred all along the railroad, both north and south of the railroad bridge which was in the middle of the area. Obviously a crewman stationed on

sometimes extend in length from Seventh Street to Eighth Street. One witness testified that on train runs he had observed a brakeman sometimes at the rear and sometimes on a car in the middle of the train. There was no testimony that such crewman was so stationed for any purpose other than the discharge of his duties in the operation of the train such as flagging at crossings, throwing switches, braking, etc.

the rear or any other car of the train could not adequately have prevented children from boarding the train at some other point, which might have been attempted from either side of the track. Especially was this true because of the winding course of the defendant's right-of-way. But even if the track throughout the area had been straight, the orbit of duty sought to be imposed would have required the defendant to have an employe on practically every car of the train or watchmen stationed on both sides of the track throughout the area.

Under the facts of this case the impracticable and burdensome task of exercising police supervision over its trains would be out of proportion to the risk to minor trespassers involved.[2]  Determinative in this regard is our recent decision in the case of *Shaw v. Pennsylvania Railroad Company*, 374 Pa. 8, 96 A. 2d 923 (1953). There two of defendant's freight trains had momentarily blocked a permissive crossing. The plaintiff, a boy of 12, undertook to climb over the cars. He had gone halfway across a flat car on the second track when the train started with a jerk and he was thrown under the wheels. He and other children and adults had climbed over the cars when they blocked the permissive path, and the plaintiff testified that this had been going on for a long time and that employes of the defendant knew about it. In affirming the entry of judgment n.o.v. for the defendant by the court below, we rejected plaintiff's contention that the railroad company should have stationed guards at the permissive crossing. Certainly if there was no duty upon the railroad company to place guards to warn against the climbing over its cars at a permissive path across the tracks, there was no duty on the part of the defendant in the instant case to police its tracks throughout the area of The Willows.

---

[2] Cf. Restatement, Torts, §339(d).

We are obliged to hold that the unfortunate accident which occurred in the present case was not attributable to any negligence on the part of the defendant, but was proximately caused by the minor plaintiff's own impulsive act.

Judgment affirmed.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion treats this case as if the plaintiff Frank A. Scibelli were an adult. In point of fact, of course, he was at the time of the accident involved only seven years of age. And it is a matter of gratification, if not pride, that the laws of this enlightened country are intelligently moulded in statute and court decision to take cognizance of the immaturity of thought, the impulsiveness of movement and the lack of serious reflection in children of tender age.

The argument in the Majority Opinion sweeps like an express train over a high-speed main track of jurisprudence, hauling precedents and dicta which have nothing to do with the question before us. The controversy in this litigation involves a single-track spur track of the law which has its own rules, its own precedents and its own fitting appreciation of the unusual facts involved.

It does not assist in the determination of the problem involved in the appeal to make such assertions as: ". . . The operation of its trains by a railroad company over its right-of-way for the transportation of freight is an essential function. It is vital to commerce, and the public as well as the railroad company has an interest therein. The maintenance of service should not be made unduly burdensome."

No one opposes these self-evident precepts. The question here is whether the duty asked of the railroad by the plaintiff would constitute an "unduly burden-

292

some" duty. Would it be unduly unburdensome for a 5-men crew on a train passing through a crowd of children to be on guard against running down one of the infants? The record in the case reveals that all 5 members of the train crew of this 11-car train remained within the cab of the engine when the train entered into the playground where it was well known children gathered, frolicked and played games. Was it too much to ask that 2 or 3 of these men leave their pinochle games, or whatever they may have been doing, to see to it that no children were crushed under the wheels of the steel cars?

The Majority Opinion well depicts the locus in quo of the episode which is the subject of this legal drama, but it does not portray the nature of the playground, which became the stage of the later tragedy. A more obvious rallying place for the spontaneous disportation of children could scarcely be imagined. "The Willows" abounded with natural and built-up phenomena which lent themselves to uninhibited fun. There were willow trees (from which the place got its name) among which the 4-to-14 year old boys raced and ambuscaded in the game of "Cowboys and Indians!" Mulberry bushes flourished and supplied succulent fruit for the boys as they hid from their comrades in Hide and Seek. The Quittapahilla Creek, in which the lads waded and swam, rippled through the area. An improvised baseball diamond and football gridiron provided space for these two exciting sports. A small hill became a coasting incline down which the children slid on improvised sleds made from cardboard boxes thrown away by a Westinghouse store close by. Sand in a sandhouse supplied the building materials for tots constructing toy castles. The older boys fished from a bridge over the creek. They even made an acrobatic springboard from an abandoned bed spring weighted down on both sides by railroad sills. By leaping on to

the anchored bed spring, they were flung high into the air, jubilant as circus clowns. Even adults could not resist this aerial attraction. One Wm. W. Uhrich, janitor in an adjacent Order of Eagles building, testified that he participated in the fun because, as he expressed it, "I went back to my kid days."

But the highlight of the summer's playday was the arrival of the railroad train with its clanging bell, sonorous whistle and all the noise and spectacle that are a delight to the heart of eager childhood. This train passed twice a day: once in the morning and then again in the afternoon. It was not a fast express, but a slow moving affair that approached, stopped, lingered and then chugged on, almost with the leisurely gait of the legendary "Slow Train through Arkansas." In passing through this children-thronged area the locomotive throttled down to the speed of a man walking. In the eyes of the children the train presented no more danger than a merry-go-round. When it stopped, they would leap aboard a car and with shouts of glee ride 5 or 10 feet and then hop off. For 18 years children had been doing this. Boys had hopped on the train, grown into manhood, and gone their respective adult ways, while the Willows playground still continued its gladsome, carnival-life existence for the young.

June 25, 1951, was no different from any other summer's day at the Willows. It resounded with the shouts of carefree boys savoring the ecstasy of living that only the young can know. At 2 o'clock in the afternoon the welcoming thunder of the train was heard. Snorting like a pawing horse it came into view and then, amid the electric atmosphere which accompanies any moving object suddenly stopped, boys raced for their momentary thrill of riding the cars. Among the lads was little Frank Scibelli, seven years old. His cousin Nellie sought to hold him still, but the gravitational excitement was too great for her clutching fingers to hold.

He broke away, seized hold of a rung of the ladder on one of the cars. Just as he was lifting himself into position, the train jerked. Frank lost his grasp and fell beneath the wheels. After the train passed he emerged, his left leg a bloody bundle. Amputation followed and his parents have come into court to ask why one or more of the five men aboard the train did not shield their child from the blow which has crippled him for life.

The Majority Opinion says that a railroad has a right of way for the transportation of freight. It is true it has a right to proceed unimpededly, but people also have the right to live, children have the right to play, and the summer has the right to pass without tragedy and without sorrow. It is not enough to say, as the Majority does, that this was an "unfortunate accident," and let it rest at that. The law is the guardian of truth and justice, of life and limb of the innocent. The accident in this case is not something that was unforeseeable. And in the affairs of men what is objectively foreseeable is factually preventable.

In 1933 the scholarly Justice MAXEY (later Chief Justice) spoke to this very subject in the case of *Mac-Dougall v. Penna. Power & Light Co.*, 311 Pa. 387, 396: "Vigilence must always be commensurate with danger. A high degree of danger always calls for a high degree of care. The care to be exercised in a particular case must always be proportionate to the seriousness of the consequences which are reasonably to be anticipated as a result of the conduct in question. Reason does not wait on usage; the latter must wait on reason. Ordinary common sense dictates that if in a harmless looking box there is something lurking that would kill or injure anyone touching that box, the latter must be so situated, if it is possible or reasonably practicable to do so, that persons are not likely to come in contact

with it. If the box must be placed where persons are likely to come in contact with it, there should be adequate warning given of its dangerous character. As this court said [referring to steam locomotives], in an opinion by Mr. Justice AGNEW in The Frankford & Bristol Turnpike Co. v. The Phila. & Trenton R. R. Co., 54 Pa. 345, 350: 'It is the duty of those who use these hazardous agencies to control them carefully, to adopt every known safeguard, and to avail themselves from time to time of every approved invention to lessen their danger to others.' "

If the law requires that "every approved invention" be used to lessen danger to others, with what more reason does it demand that simple physical care be exercised to save others from death or serious injury? If anyone of the five men of the train crew of the "Willow" train had thrown off his slothful inattention and stepped out to observe the youthful "invasion" of the cars, he would have seen Nellie seeking to restrain her infant cousin and, with an appropriate signal, the crewman could have held the train until Frank was removed from danger. This was a duty which the railroad company owed not only to humanity but to law as proclaimed by the courts of the land.

The Majority Opinion would seem to suggest that never has there been a set of circumstances like those in the case at bar and that, therefore, we must wait until this Court or some other Court throws the armor of protection around other Frank Scibellis before we can declare this Frank Scibelli entitled to redress. Even assuming (which I do not concede) that where an obvious infringement of personal rights are involved, we must wait on some other fountain of legislative or judicial learning to first proclaim the manner of correcting injustice while our own reservoir of power remains untouched, the fact is that this Court has already written

authoritative precedent which should have assured to Frank Scibelli the right to adequate redress for the injustice he has sustained.

As far back as 1858 this Court allowed a recovery where a child was injured in circumstances which would suggest a far greater departure, on the part of the injured plaintiff, from prudence than might appear in this case. There, a boy 9 years of age crawled under railroad cars which were halted at a crossing. While beneath the cars the train started and the boy was seriously injured. It was argued in that case by the railroad company that the imprudence of the boy denied him and his parents a recovery. This Court held otherwise: "We cannot say it was, as a legal conclusion, and the jury did not find it as a conclusion of fact. Nay, indeed, it may be well doubted whether most boys, grown familiar with trains of cars by daily observation, would not, in like circumstances, have acted as this boy acted. To many active and enterprising children, risks not absolutely appalling, are attractive; especially if others are at hand to witness the daring achievement. . . We cannot, therefore, account this boy's conduct unnatural or extravagant." (*P. R. Co. v. Kelly*, 31 Pa. 372, 378.)

In an early case (1886) our Court allowed a recovery under circumstances involving principles not dissimilar to those in the case at bar, (*Phila., Baltimore and Wilmington R. R. Co. v. Layer*, 112 Pa. 414, 418). A child 6 years of age, eager to join up with other boys in a masquerading party, attempted to pass between two railroad cars halted at a crossing. He was injured when the cars came together. This Court affirmed the judgment returned against the railroad company on the ground that the defendant company failed to warn the child of the impending danger: "Certainly, the defendant could not, in view of this evidence, call

upon the court to instruct the jury, as a matter of law, that the company owed no duty to the public or to this child. It may be that the warning, if given, would not have been heeded by the child; *but this does not dispense with the duty;* the defendant cannot be relieved from liability on a mere conjecture; if, after the exercise of *due care* by the company, the child had been injured, no responsibility would result." *

Where a railroad company allows children to use its tracks as a playground, it must exercise toward them such care as the circumstances require. In *O'Leary v. Pittsburgh & Lake Erie Railroad Company,* 248 Pa. 4, 9, we said: ". . . the defendant company had the right to insist on the exclusive use of its tracks, and any person, infant or adult, going upon them would be a trespasser, yet when constant use for many years had been made of them by the children of the community as a playground with the defendant's knowledge and tacit acquiescence, the rights and duties of the parties changed and those using the tracks under such circumstances *cannot be regarded as trespassers* to whom the company owed only a duty as such. Parties making use of the premises under those circumstances have the right to believe that it is without objection and with permission of the company and that *it will exercise such care towards them as the circumstances require.*"

In *Davies v. Delaware, Lackawanna and Western Railroad Company,* 370 Pa. 180, 183, this Court said: ". . . If the 'playground' rule applies, *then defendant must anticipate the presence of children on the track and would be liable for ordinary negligence;* otherwise the child is . . . liable only for wilful or wanton negligence."

---

* Italics mine, unless otherwise indicated.

The Majority states that the case of *Gawronski v. McAdoo,* which was cited in behalf of the plaintiffs' case, is "inapposite." I believe, on the contrary, that the *Gawronski* case is very apposite. The difficulty with the Majority's position is that it has apparently ignored the apposite portion of the *Gawronski* case. Our Court there said: "We have repeatedly held that, where a railroad company permits its yards or tracks to be used as a playground for children, the corporation is required to operate its rolling stock *with due care to avoid injuring such children,* and that the ordinary rule, as to the limited measure of duty owing to trespassers, is inapplicable. (Citing cases).

"We have held likewise that one fixed with a duty to regard the safety of children is obliged *reasonably to anticipate* they will do *the ordinary and natural things which may be looked for from them under the circumstances.* What we said in Hydraulic Works Co. v. Orr, 83 Pa. 332, 336—'The mind . . . sees at once that in such a place, and under these circumstances, he [defendant] had good reason to expect that one day or other some one, probably a thoughtless boy, . . . would be led there'—is not inappropriate here, when considering plaintiff's position on defendant's cars."

What were the ordinary and natural things that the crew could expect of the children here as the defendant's train rolled through the Willows? The obvious answer is that it could be expected that the children would board the train for a short ride, not "steal a ride" as the Majority with unnecessary harshness puts it. The boys had been taking these rides for 18 years. Under these circumstances should not the crew have exercised *due care* to keep the boys off the cars. or, once on the train, get them off without injury?

The legal determination on this appeal is not whether the plaintiff should recover. The issue is

whether he is not entitled to have a jury determine whether he met the burden of proof that the defendant did not act with due care under the circumstances. And that is exactly why the *Gawronski* case is *apposite*: ". . . it becomes clear the case was for the jury—*to say whether or not the railroad acted with due care toward these little ones* when, without requiring its employees either to give the boys warning or clear them off the cars, it permitted the collision which led to plaintiff's injury.

The Majority seeks to differentiate the *Gawronski* case from the one at bar by saying: "For at least three-quarters of an hour before the accident the minor plaintiff and 14 other boys were seated on the freight car watching a ball game in full view of a number of defendant's employees. Thus there was implied if not express permission to use the cars which customarily remained standing on the tracks for a considerable period of time."

If three-quarters of an hour constitutes notice of danger in the *Gawronski* case, what must be said of the *Scibelli* case where the defendant's employees knew for 18 years that boys were boarding trains?

The Majority Opinion in a footnote controverts the plaintiff's counsel's assertion that on previous trips a crewman was posted toward the rear of the train to warn or deter children. The record shows witness Uhrich testifying as follows: "Q. Mr. Uhrich, did you ever observe where the brakeman would ride the train from time to time? A. Well, the brakeman, the morning runs there is one on the front and *there would be one on the back,* and at times he would be in the middle of the train, standing in a low car or sitting on a boxcar, and lots of times I would see him, especially in the summer months, that he would holler to some of the chil-

dren, younger fellows that were along the railroad trying to jump on and off."

James Manz testified: "Q. Did you notice when you were back there during those times that you played, were any of the men who worked on the train, where they were on the train? A. Well, some were in the cabin and sometimes *there were some on the end of the train, on the last car.*

However, aside from this definitive evidence that the railroad company did post crewman at the rear of trains and also at the center of trains, the principle of law is unyielding that in order to discharge its responsibility of due care under the circumstances, the railroad was required to guard the train so as to protect children from harm.

The law is not as cold and bleak as the Majority would seem to suggest it is. In *Hawk et ux v. P. R. R.,* 307 Pa. 214, this Court quoted with approval the principle which is accepted in every country worthy of being regarded as civilized: " 'When human life is at stake, the rule of due care and diligence requires everything that gives reasonable promise of its preservation to be done, regardless of difficulties or expense.' " (20 Ruling Case Law, page 25, section 18).

The expense of safeguarding the children in The Willows would not be exorbitant. The distance in the play area along the defendant's tracks was estimated to be only 375 feet. A fence along the right of way, as it passed through the Willows, would have kept children off the train. Did the defendant company exercise due care in not erecting such a fence? That was a question for the jury.

In the case of *Patterson v. Palley Mfg. Co.,* 360 Pa. 259, a 14-year old boy was injured when a wall fell over into a lot used by him and other children as a playground. Opposing the verdict returned in favor of the

injured child, it was asked by the defendant company what could have been done to avert the accident. This Court, speaking through Mr. Justice HORACE STERN (now Chief Justice) said: "The answer is that it should have placed a guard or watchman upon the premises in order to see to it that the children remained away from the vicinity of the wall in the dangerous condition in which it was then standing; while the children might, of course, have evaded a watchman's vigilance defendant at least would then have done its duty and not been remiss by failing to take all reasonable measures to prevent their being injured."

The erection by the railroad company of a fence to keep children off the trains in the Willows would have entailed but a meager expense. And had such a fence been erected, the railroad could properly have defended that it used due care under the circumstances. But it would not even have had to build a fence in order to discharge its responsibility. There were only 11 cars in the train on June 25, 1951. Five men distributed throughout the length of the train would have given each guard only two and a fraction cars to watch. The cars involved were flat cars and thus offered a clean sweep of vision to their guardians, had they not somnolently ignored the duty which law and humanity imposed on them.

How can it possibly be said with any semblance of reason that the train crew exercised due care under the circumstances when with pinochle indolence they sat within the cab of the engine as the train passed through the fragile children?

The Majority says: "We have been referred to no case where a court has gone so far as to require a railroad company to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them."

This would suggest that the defendant company was being required to maintain a battalion of constabulary to patrol the entire length of its railroad which here, incidentally, was only a "single track spur railroad in the City of Lebanon" running between the railroad yards at "12th Street and the plants of the Bethlehem Steel Company east of its yards."

When the Majority speaks of "patrolling tracks" it conveys an entirely erroneous conception of the duty that justice, law and common sense ask of the defendant. The entire playground area known as The Willows occupies only one city block from 7th to 8th Streets. How much would it cost the railroad to guard *one block*? How long does it take a train to cover 375 feet? Even travelling at the pace of a man's walk. What the Majority has painted as a mobilization of police reserves to patrol a railroad amounts in point of reality to a short ride of some five minutes' duration on a single track through a children's playground!

In fact, no permanent guard at all is required or needed in The Willows to watch a short jerkwater train travel 375 feet twice a day. It would be enough for one of the train crew, as the train stops at The Willows, to jump off the engine and stand by the side of the track to watch the cars while the train pauses, and then hop aboard the last car after the other cars pass by. This is done at regular railroad crossings where trains stop and always at small railroad stations. If this simple procedure had been followed on June 25, 1951, the juvenile hurly-burly at The Willows would have been kept under control and Frank Scibelli would still have his own two legs on which to walk for the remainder of his journey through life.

The Majority is of the impression that because the train crews had on previous occasions made efforts to keep children from the train, this acquitted the crew of

the need to continue to be vigilant. In *Kremposky v. Mt. Jessup Coal Co.,* 266 Pa. 568, a 9-year old boy was injured while crossing a bridge. There was testimony in the case that boys had repeatedly been ordered to stay away from the bridge. This Court said that previous admonitions could not deprive a present plaintiff from recovery where the defendant had failed in due care: "It cannot be affirmed as a matter of law that plaintiff was precluded from using the walk because of trespass signs posted over fifty feet from the bridge, *nor because other boys had been warned to keep away,* nor because Stephen might have gone for the cows by another route."

In *Altenbach v. Leh. Val. R. R. Co.,* 349 Pa. 272, the defendant company maintained a reservoir around which children were known to have played for five years. "They coasted and rolled down the embankment outside the fence, fished for tadpoles in the summer and skated on the ice in the winter." Obviously aware of the dangers presented by this reservoir, the defendant company built a fence around it. However, it allowed the fence to become delapidated and a 3½ year old child fell into the water and was drowned. In allowing a recovery for the death of the child, our Court said that while the defendant had met its duty in the erection of the fence,—"It failed in its duty of ordinary care, however, when it permitted this fence to get into a condition of disrepair such as was shown by the testimony. This condition destroyed the real purpose of the fence and under this testimony the jury could properly find the defendant negligent toward the minor plaintiff."

In this case it is irrelevant that the railroad train crews had on previous occasions made efforts to keep children away from the train. The criterion of responsibility is what they did on *June 25, 1951.* In terms of

the *Altenbach* case the reservoir fence broke down that day and, as a consequence, the railroad company became responsible for the accident which followed.

The principle of responsibility here is no different from that involved in the famous "turntable cases." In one of those cases, *Thompson v. Reading Co.*, 343 Pa. 585, children were known to have played in and about the turntable "almost every day in the summer and about twice a week during the rest of the year." When an 8-year old boy was injured at the turntable and the railroad company was sued, it argued in defense that the turntable was elevated some 20 or 25 feet above the street level and that, therefore, it could not be held liable since the plaintiff child had surmounted an inaccessibility. In rejecting this contention, we said: "The attractiveness and comparative accessibility to children of a potentially dangerous instrumentality are circumstances by which the owner's want of care is tested. If it is *in fact* inaccessible, no want of care can be imputed to its owner. But if it is only *apparently inaccessible* but *in fact* accessible to children, and the owner knows this or ought to know it he exhibits negligence if he fails to do these simple things which would make it harmless. That was the situation here." (Italics in original decision.)

We also laid down in that case the principle which should be the main track over which the train of responsibility should move in this case: "Young children have no foresight and scarcely any apprehensiveness of danger. This is a circumstance which those owning instrumentalities potential for harm must bear in mind, for it is every individual's duty to use toward others what due care *then* and *there* requires. The question whether or not injury to a child legally incapable of negligence will import negligence to the owner or

possessor of the injuring instrumentality depends on the circumstances. . ." (Italics in original decision.)

How does the principle of law in this case differ from the one so solidly ballisted in the case of *Hogan v. Etna Concrete Block Co.,* 325 Pa. 49? There a five-year old boy was crushed beneath a concrete-carrying car on a little railroad operated by the defendant company. For years children had played around these cars. In affirming judgment for the plaintiff this Court said: "In the case at hand the jury was well supported in finding defendant negligent toward the minor plaintiff. This diminutive railroad had by its nature and from past experience a particular fascination for boys. Cf. Reichvalder v. Borough of Taylor, 322 Pa. 72. The readily movable car loaded with a ton and a half of concrete blocks poised at the top of the grade was obviously dangerous. It is no answer that the child may have himself set the car in motion, though it may be inferred he did not . . . *The case was clearly for the jury and its verdict cannot be disturbed.*"

The Majority states that "a necessary element of the playground doctrine is permission or acquiescence in the use of the owner's property." The real test is not whether the owner acquiesced in the trespass but, knowing what was happening, whether he exercised ordinary care so as to prevent what was foreseeable. In *Bartleson v. Glen Alden Co.,* 361 Pa. 519, the minor plaintiff was injured by coming into contact with electric wires on a tower up which he had climbed. The tower was within an unsecured gate on the defendant's property. In affirming the judgment returned in favor of the plaintiff, this Court said: "The defendant was guilty of negligence when it failed to exercise ordinary care in safeguarding the tower . . . Having failed to exercise ordinary care in securing the gate, *it was foreseeable that children would be attracted to the tower*

innocent of its dangerous nature or under the misapprehension that the power was turned off. It has not been suggested that the coal company would have suffered any inconvenience by exercising due care. The installation of a locking device, at negligible cost, would have obviated the risks to children."

In the same way there was a duty on the part of the defendant railroad company here to exercise due care to prevent children from climbing aboard its alluring train as it passed through The Willows.

Whether it did take reasonable precautions was a question submitted to the jury as follows: "Does the jury find that the defendant exercised ordinary care toward the minor plaintiff, Frank Scibelli?" The jury answered this question with a categorical No. What right do we have to nullify that answer?

Then the Majority states that while the defendant may have been "chargeable with acquiescence in the use of the track as part of the children's playground, this is not true of the trains which operated on the track." But is it possible to distinguish between the railroad track on the playground and the train on the railroad track on the playground? In the *Bartleson* case we very emphatically said: (p. 528) "There is no rule which requires that the dangerous condition must be on the ground or within reach of a minor. Such a distinction is artificial, without logic or experience to support it. What this distinction really drives at is the question of whether or not a defendant shall be held reasonably to anticipate that a child will bring himself within the orbit of the danger."

When the train with its shining engine and clattering, thrilling cars came before the eyes of little Frank Scibelli, he felt an instinctive urge to climb aboard. The ladders on the cars invited his hands to seize the rungs and his feet to follow in mounting. Responding

to these irresistible impulses it was easier for Frank to climb than not to climb. That children have this urge is common knowledge. We recognized that trait in the same *Bartleson* case when we said: "That children will accept a situational invitation to climb is a matter of common knowledge . . . The jury found that plaintiff did not realize or at best imperfectly realized his exposure to danger. The tower was not so obviously danger-gerous that the child must be deemed to perceive the risk involved as though he were an adult."

In the case of *Reichvalder v. Taylor Borough,* 120 Pa. Superior Ct. 217, where a child was injured by climbing on to a road scraper in a vacant lot used by children as playground, a verdict returned in favor of the plaintiff was sustained by the Superior Court, President Judge RHODES saying: "We are of the opinion the jury could properly find that the scraper was of such a character, and was so located, under the circumstances, that *the defendant should have reasonably anticipated that children would climb upon it, if given the opportunity, in their play.*"

The railroad company presented no evidence at the trial. No member of the train crew was called to testify. In view of the fact that 5 men rode in the Diesel engine which was faced with transparent glass and passed within 10 feet of Frank Scibelli, the natural inference is that one or more of the crew saw Frank and his companions. This is an inference quite valuable to the plaintiff because the winning party in a jury trial is entitled to have, on review, the evidence considered in the light most advantageously possible to his cause. In *Hall et al. v. Vanderpool,* 156 Pa. 152, this Court said: "Where evidence which would properly be part of a case, is within the control of the party whose interest it would naturally be to produce it, and, without satisfactory explanation, he fails to do so, the jury may

draw an inference that it would be unfavorable to him."
Because of the failure of the train crew to take the
stand, the jury was completely justified in this case in
concluding that had the crew testified their testimony
would have been unfavorable to the company. This in-
ference of itself warrants the finding that the railroad
company failed in its duty to exercise due care under
the circumstances.

The jury found, in answer to specific interrogator-
ies, that:

1. The Willows was a playground.

2. The railroad Company recognized it to be a
playground.

3. The railroad company consented to the use of
the Willows as a playground.

4. The railroad company did not exercise due care
toward the plaintiff.

5. The minor plaintiff, Frank Scibelli, did not
have sufficient capacity and understanding to see and
appreciate the danger and avoid it.

6. Frank Scibelli did not commit any act of negli-
gence which in any way contributed to the happening of
the accident.

The record shows that each and everyone of these
findings by the jury was supported by legal evidence.
As a result of these findings the jury awarded to Frank
Scibelli damages in the sum of $14,500 and to his par-
ents damages in the sum of $7,500. The Majority wipes
away this $22,000 verdict on a record that, in my judg-
ment, comes within all the precedents of this Court in-
volving accidents to minor children.

Frank Scibelli is still a boy. Bewildered as he must
be by all that has happened to him in his tender years
he probably will conclude, as he hobbles about dragging
a steel and wooden shackle clamped to the stump of his
leg, that Justice, like the men in the engine cab, is

blindfolded against boys playing on railroad tracks, even though Society, through unfathomable processes, still drives them there.