## Richmond

ETTA TILLER, ADMINISTRATRIX OF THE ESTATE OF WILLIAM R. TILLER, DECEASED v. NORFOLK AND WESTERN RAILWAY COMPANY, A CORPORATION.

March 13, 1950.

Record No. 3588.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley and Buchanan, JJ.

The opinion states the case.

*Richardson & Kemper* and *Joseph S. Gillespie*, for the plaintiff in error.

*Bowen & Gillespie*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

William R. Tiller, an employee of Hardwood Products, Incorporated, was killed at St. Clair's crossing, in Tazewell county, while riding in a railroad boxcar which was being shifted by a train crew of the Norfolk and Western Railway Company. In an action for wrongful death his administratrix recovered a verdict against the Railway Company. Being of opinion that the Railway Company was not legally responsible for Tiller's death, the trial court set aside the verdict and entered a judgment for the defendant company, and to review that judgment the present writ of error has been allowed.

The Hardwood Products is engaged in the handling and processing of lumber and maintains a plant located on the south side of the main line of the Clinch Valley Division of the Norfolk and Western Railway Company at St. Clair's crossing. For the purpose of loading and unloading cars a spur track leaves the main railroad east of the Hardwood Products plant and runs back in a westwardly direction south of and nearly parallel to the main line. A loading platform of the approximate height of the floor of a railroad boxcar extends from the building to within a few feet of the southern side of the spur track.

On January 21, 1947, Tiller, the deceased, and three other employees of Hardwood Products had been assigned the task of unloading lumber from one of three boxcars standing on the spur track opposite the platform. John H. Lambert and Garney Alley were working inside the car, passing lumber through the open door to Tiller and Fred Ireson, whose duty it was to place the lumber on a small truck and roll it by hand along the platform to a point where it was to be stacked. During the afternoon, and while the car was being thus unloaded, a local freight train approached St. Clair's crossing from the west. This train carried a car which was to be left on the Hardwood Products spur track. For the purpose of facilitating the unloading, the foreman of the Hardwood Products had also requested the train crew to shift or change the relative positions of the three cars already standing on the spur track.

In order to superintend the necessary shifting the conductor of the freight train left the caboose, walked across the main line and spur track, and came up on the Hardwood Products loading platform.

Before the shifting operation began, J. H. Williams, the foreman of Hardwood Products, came by the car from which Tiller and his companions were unloading lumber, told them of the intended operation, and instructed them to stop work. This direction was promptly complied with. The shifting of cars in this manner was a daily occurrence, and the testimony of Williams is that the employees under his supervision had been instructed "to keep off those cars while they are being moved or shifted."

Despite this warning, before the shifting began, Tiller, unseen either by his foreman, by the conductor, or by any member of the train crew, either to escape from the severe cold weather, or in a spirit of adventure, got into the car which he had been assisting in unloading, and with his fellow-employee, Lambert, remained there throughout the shifting operation hereinafter described.

After the engine had been cut loose from the train of cars on the main track it was driven eastwardly beyond the switch, then reversed and run onto the spur track where it was coupled with the three cars standing alongside the plant. These cars were then pulled eastwardly along the spur track beyond the switch onto the main line. The engine was again reversed and the three cars were pushed westwardly along the main track toward the train of cars which had been left standing on the main line. As is customary, after the three cars had received considerable impetus from the engine, they were uncoupled and left to "drift" or proceed under their own momentum toward the standing cars and struck them with sufficient force to effect a coupling.

There was evidence on behalf of the administratrix that the impact of the three shifting cars with the stationary train of cars was unusually violent and noisy. Lambert testified that he was thrown to the floor of the car in which he and Tiller were riding. On the other hand, the testimony of the members of the crew was that the operation was carried out in the usual way, and that the engine imparted to the shifted cars only a sufficient momentum to take the up-grade at that point in order to effect a coupling with the standing cars.

At any rate, the impact was of sufficient force to cause the open door to slide suddenly to a closed position and crush Tiller's head, killing him instantly. At the time he was standing in the doorway of the car.

The gist of the claim of the administratrix is that in shifting the car the train crew failed to exercise ordinary care for decedent's safety after they knew or should have known that he was riding therein.

In riding on the car during the shifting operation Tiller was clearly a bare licensee or a trespasser. His duties in connection with unloading the car had been suspended, pursuant to the orders of his foreman, and he had no business on it. He boarded it voluntarily for his own purpose and without the permission of the Railway Company or any of

its employees. See 52 C. J., Railroads, section 2121, p. 549, and cases there cited.

Ordinarily, a railroad company owes to a trespasser or bare licensee on its property the negative duty not to injure him wantonly or wilfully after having discovered his presence. It owes him no duty of prevision or preparation for his discovery (*Hawkins* v. *Beecham*, 168 Va. 553, 560, 191 S. E. 640, 643), and, before shifting cars standing on a sidetrack, is not required to search for trespassers thereon. 44 Am. Jur., Railroads, section 430, pp. 650, 651; 43 A. L. R. 38, Anno.; *Angiline* v. *Norfolk, etc., R. Co.*, 99 W. Va. 85, 128 S. E. 275, 277, 278, 43 A. L. R. 34.

In Virginia, and in some other jurisdictions, this general rule is subject to the qualification that in order for a railroad company to incur liability to a trespasser it is not necessary that its employees should actually know of his danger or peril. It is enough if the employees have notice of what would cause a person, in the exercise of ordinary care, to be alerted to the danger. After such notice they must exercise ordinary care to avoid injuring a person, even though he be a trespasser. *Washington, etc., Railroad* v. *Taylor*, 188 Va. 458, 50 S. E. (2d) 415.

To state the matter conversely, when no one is known or believed to be in danger, a railroad company is under no obligation to prepare for what is not anticipated, or to stop or examine where no harm is suggested by the circumstances. *Tucker* v. *Norfolk, etc., R. Co.*, 92 Va. 549, 553, 24 S. E. 229; *Atlantic Coast Line R. Co.* v. *Gates*, 186 Va. 195, 200, 42 S. E. (2d) 283, 286.

Tested by these principles we are of opinion that the employees of the Railway Company were guilty of no breach of duty which they owed to the decedent.

The evidence is uncontradicted that none of the members of the train crew actually knew until after the accident that Tiller, or his companion, Lambert, was riding in the car during the shifting operation.

Nor was there evidence of any circumstance which put the members of the crew on notice that the decedent was in the car while it was being moved. All of the Hardwood Products employees working in and around the cars knew that the shifting operation was about to begin, and pursuant to the direction of their foreman, suspended work on the cars. The undisputed evidence is that none of these employees had on other occasions ridden on cars during shifting operations.

It is true that Lambert testified that while he was standing in or near the doorway of the car he saw the conductor on the near-by platform talking to the Hardwood Products foreman, Williams, and from this it is argued that the jury had the right to infer that the conductor, in the exercise of ordinary care, should have seen him (Lambert) in the car.

While Lambert's testimony is not entirely clear on the point, apparently this incident occurred just as the shifting engine arrived and the Hardwood Products employees suspended their work on the car. As Lambert said, Alley, his fellow-employee, had just gotten out of the car and there was no one else in there with him (Lambert).

Under these circumstances, even if the conductor had then seen Lambert, he had the right to assume that since the work on the car had been suspended, and the shifting operation was about to begin, Lambert would remove himself to a place of safety by getting out of the car.

Certainly, there was nothing in this incident to put the conductor on notice that Tiller, whose duties had never required him to be in the car, would thereafter board it.

It is argued that inasmuch as the conductor testified that it was his duty to inspect the cars before moving them, and that he did so on this occasion, he was negligent in not discovering the presence of the decedent in the car.

But, as has been pointed out, the Railway Company owed the decedent no duty to search the car and ascertain whether he was aboard. It is elementary that where there

is no duty, there can be no actionable negligence. *Norfolk, etc., R. Co.* v. *Wood,* 99 Va. 156, 158, 37 S. E. 846.

Since the conductor and other members of the crew were not chargeable with notice that the decedent was aboard the car during the shifting operation, it is not necessary that we decide whether they failed to exercise ordinary care for his safety in the manner in which the shifting operation was performed.

■ There is another ground upon which a recovery in favor of the administratrix is precluded. When Tiller voluntarily boarded the car, where he had no duty to perform and knowing that it was to be shifted, he assumed the risk incident thereto.

■ The defense of assumption of risk, while closely associated with that of contributory negligence, is distinguishable therefrom. As is tersely said in *Hunn* v. *Windsor Hotel Co.*, 119 W. Va. 215, 193 S. E. 57, 58: "The essence of contributory negligence is carelessness; of assumption of risk, venturousness. Thus an injured person may not have acted carelessly; in fact, may have exercised the utmost care, yet may have assumed, voluntarily, a known hazard. If so, he must accept the consequence."

"While assumption of risk is often a matter of implied contract, as in case of master and servant, it is not always and necessarily so. The mere doing of an act, in the absence of any contract, may be the assumption of risk, as is illustrated by engaging in athletic sports and the like. A man who crosses a railroad track in front of an approaching train assumes the risk of getting across in safety. We assume risks in many ways every day, without any relation to contract." *Weston* v. *Hospital of St. Vincent of Paul*, 131 Va. 587, 593, 107 S. E. 785, 23 A. L. R. 907. See also, 38 Am. Jur., Negligence, secs. 171, 172, pp. 845, 846, 847.

For these reasons we are of opinion that the action of the trial court in setting aside the verdict was entirely proper, and therefore the judgment is

*Affirmed.*