# Richmond

GEORGE W. ARRINGTON, ADMINISTRATOR, ETC. v. LESLIE L. GRAHAM, ADMINISTRATOR, ETC.

March 5, 1962.

Record No. 5392.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and Carrico, JJ.

*James C. Turk* and *John N. Dalton* (*Dalton, Poff & Turk*, on brief), for the plaintiff in error.

*Kenneth I. Devore* (*Snidow & Devore*, on brief), for the defendant in error.

SPRATLEY, J., delivered the opinion of the court.

Leslie L. Graham, administrator of the estate of William D. Graham, deceased, instituted this action by filing a motion for judgment against George W. Arrington, administrator of the estate of Willard W. Aliff, deceased, seeking to recover damages for the alleged wrongful death of Graham, while riding as a guest-passenger in an automobile operated by Aliff.

At the conclusion of plaintiff's evidence, and also at the conclusion of all the evidence, the defendant moved to strike the evidence of the plaintiff, and enter summary judgment for the defendant upon the grounds that plaintiff's decedent was, as a matter of law, guilty of contributory negligence, and of assumption of risk. The motion was overruled, and the case was submitted to the jury. The jury returned a verdict in favor of plaintiff for $10,000.00.

The defendant moved to set the verdict aside and to enter final judgment in his favor upon the grounds that it was contrary to the law and the evidence, without evidence to support it; for error in giving and refusing certain instructions; and for error in the admission and rejection of certain evidence. The motion was overruled; judgment was entered on the verdict; and we granted this writ of error.

The evidence is without material conflict and may be summarized as follows:

On August 17, 1960, at approximately 2:35 o'clock p.m., William D. Graham, while riding in a 1955 Ford automobile sedan, operated by Willard W. Aliff, was killed when the automobile struck a concrete bridge abutment on U. S. Route No. 11. The accident occurred approximately ½ mile east of Shawsville, in Montgomery county. There Route No. 11 is a 4-lane, divided highway, two lanes running east and two lanes running west with black top surface. The weather was clear and the road dry. Only Graham and Aliff were in the automobile, and both were instantly killed. The automobile was bound westerly, and the collision occurred as a right-hand curve ended at a bridge over Roanoke river. East of the curve, the highway runs straight towards the east for one mile.

About midday of August 17, 1960, Aliff drove his 1955 Ford automobile to the residence of Delmar Cline in Montgomery county. He had been drinking prior to his arrival, and was said to be not in "too good shape." He requested permission, and was allowed to bring into the Cline residence a 4/5 quart bottle of gin, 1/3 full, and he and Homer Cline each took a drink therefrom. Aliff then asked

Homer Cline to go riding with him. The two got in Aliff's Ford automobile and rode by the gasoline service station of Robert Starkey on Route No. 11 at Elliston, Virginia, one or more times, and then drove into the station to get some air in a front tire.

Three brothers of Robert Starkey, Hoover, Charles, and Nelson Ray, and William D. Graham were at that station. There Aliff gave Charles Starkey a drink from his bottle of gin. A short while afterwards, Graham got in the automobile with Aliff and Cline, and Aliff drove about 500 yards from the station, stopped the car off the highway, and Aliff and Graham there drank the remainder of gin in the bottle and threw the bottle away. Aliff then drove them back to the service station. While there, Aliff drove in and out of the station several times, ran over a concrete curb, and backed into a light pole. Robert Starkey, the operator of the service station, said that when Aliff started on the 500-yard trip, "he went over on the other side of the road—he went on the wrong side of the road then," and when he returned from that trip, he drove up to the station "pretty fast," and was "spinning" the wheels of his automobile around the driveway until he, Starkey, protested. He said that the operation of the car by Aliff was in the presence of Graham and most of the group of persons mentioned.

Some of the group said they would like to go to the State A. B. C. store in Christiansburg, and get something more to drink. Aliff asked Homer Cline to go with them. Cline told Aliff, in the presence of Graham, "You have been drinking quite a bit, and if I go, I'll drive." Cline, then with Aliff, Graham, Hoover Starkey and Nelson Ray Starkey, got in the car, and Cline drove them to Christiansburg. Aliff there got out of the car, went to the A. B. C. store, and purchased two bottles of gin. On the return trip, Aliff, Graham and the two Starkeys drank all of one bottle. Cline did not drink any of it. When they reached the service station around 1:30 p.m., everyone got out of the car except Aliff. Aliff asked for and obtained a "coke" to mix with a drink.

Shortly thereafter, Cline suggested he would like to go home. Aliff told him to get in the car. Cline again refused to do so unless Aliff would let him drive. Aliff declined to do so. Cline testified that, in the presence of Graham and some of the Starkey group, he said, "I wouldn't ride with him the way he was driving. We were going down the road with it wide open, and he said the car always sticks on 30;" that Aliff hit the speedometer with his fist and it went up

to 120 miles an hour and stayed there; and that Aliff laughed and said, "What do you think of that?" He further said that when he made the above statement, Graham was "kinda laughing and smiling while leaning on the left side of the car." When some question was raised as to the condition of the speedometer, Cline said that he was also judging speed "by the telephone poles going by."

Aliff then asked Graham to get in the car. They left the station with Aliff at the wheel, and went to Graham's home to get lunch. Not finding any food prepared, they returned to the station, with Aliff observed to be driving at a normal rate of speed. Shortly thereafter Aliff again asked Cline to get into the car. Cline went to the car, walked around it to get in the driver's seat, and as he did so Cline said Aliff "drove up about 3 feet and did that about three or four times, and then pulled away from the station," and began the trip that brought death to Aliff and Graham.

Charles Boydton, driving a truck in a westerly direction on U. S. Route No. 11, said that the Aliff automobile came up behind his truck, and traveling at a "rather high rate of speed" passed him approximately 300 feet from a bridge ahead of them. Said Boydton: "* * * as they got approximately one hundred feet or a little better in front of my truck, I noticed the rear of the automobile skidded approximately a foot or a little better to the right, and then started back, and as the automobile started back to the left, it skidded more or less at a forty-five degree angle with the bridge, up to the bridge and the nose of the automobile struck the left-hand end of the bridge and made a complete turn in the air and hit head-on in the bank on the other side of the river."

On cross-examination by plaintiff's counsel, Boydton estimated Aliff's speed to be in excess of 90 miles per hour.

State Trooper R. C. Keesee said he received a call about 2:35 p.m., on August 17, and went to the scene. He found the Ford completely demolished and both occupants dead. He said: "The vehicle left the highway on the left side, continued three hundred forty-eight feet after leaving the highway on the left side, to where it stopped. From the last tire marks—from the place where the tire marks ended on the left side of the highway to the next marks I found, where the vehicle stopped, was one hundred fifty feet." He described the tire marks and said that the vehicle went through the air for 150 feet.

The speed of the automobile and the results of its collision with

the bridge abutment conclusively show that it was being operated in a way sufficient to shock the conscience of reasonable men. There should be no doubt as to the negligence of Aliff. The primary and controlling issue is whether Graham was, as a matter of law, guilty either of assuming the risk, or of contributory negligence.

Plaintiff, the administrator of Graham, does not in his brief discuss the doctrine of assumption of risk. He argues that the issue was whether Graham was guilty of contributory negligence, and that was for the jury to resolve under the facts.

The doctrines of assumption of risk and contributory negligence are not identical. They are closely associated; but there is a distinction between them which has not always been observed in the decisions.

"The essence of contributory negligence is carelessness; of assumption of risk, venturousness. Thus an injured person may not have acted carelessly; in fact, may have exercised the utmost care, yet may have assumed, voluntarily, a known hazard. If so, he must accept the consequence." *Hunn* v. *Windsor Hotel Company*, 119 W. Va. 215, 193 S. E. 57, 58; *Tiller* v. *N. & W. Ry. Co.*, 190 Va. 605, 612, 58 S. E. 2d 45.

It is now fairly well settled that where one voluntarily assumes the risk of injury from a known danger, he is debarred from a recovery in negligence cases. *Weston* v. *Hospital of St. Vincent of Paul*, 131 Va. 587, 593, 107 S. E. 785, 23 A. L. R. 907; 38 Am. Jur., Negligence, § 171, pages 845 and 846.

Various statements of the distinction between the doctrines of assumed risk and contributory negligence are found in the cases. Among them are the following: "(A)ssumed risk implies intentional exposure to a known danger, which may or may not be true of contributory negligence; and that assumption of risk embraces a mental state of willingness, while contributory negligence is a matter of conduct." 65 C. J. S., Negligence, § 117, page 711; 38 Am. Jur., Negligence, § 172, page 847.

Here, Graham voluntarily got in an automobile and rode with Aliff after he knew Aliff had been drinking for sometime immediately prior thereto; after he had heard Cline repeatedly refuse to ride in the car with Aliff driving, and had given specific reasons for his refusal; and after he had seen Aliff's conduct, movements, behavior, and manner of operating a car improperly. Graham got in the car with his eyes and ears wide open to the dangers and risks threatened.

It is difficult to conceive of stronger warnings of danger. He must be held to have accepted the risk and the consequences. He was not merely careless; but was venturesome in accepting the obvious risk.

It is our conclusion that the uncontradicted evidence shows that plaintiff's decedent, Graham, with full notice that Aliff could not, or would not, drive properly, voluntarily assumed the risk of traveling in the automobile driven by the latter. In view of this conclusion, we do not find it necessary to discuss or pass upon the correctness of the ruling of the trial court upon the granting or refusal of instructions, upon the admission or rejection of the evidence, nor of any of the other assignments of error.

The verdict of the jury is set aside; the judgment of the trial court reversed; and a final judgment entered here for the defendant, George W. Arrington, administrator of the estate of Willard W. Aliff.

*Reversed and final judgment.*