## Richmond

NORFOLK SOUTHERN RAILWAY COMPANY v. DANNY DEAN FINCHAM, AN INFANT, ETC.

NORFOLK SOUTHERN RAILWAY COMPANY v. WOOD R. FINCHAM.

June 12, 1972.

Record Nos. 7648 and 7649.

Present, Snead, C.J., I'Anson, Carrico, Harrison, Cochran and Harman, JJ.

*Thomas R. McNamara* (*William C. Worthington; Richard M. Swope; Williams, Worrell, Kelly & Worthington,* on brief), for plaintiff in error in Record Nos. 7648 and 7649.

*Henry E. Howell, Jr. (Jack K. Moulton; Donald J. Coureas; Howell, Anninos & Daugherty,* on brief), for defendant in error in Record Nos. 7648 and 7649.

HARMAN, J., delivered the opinion of the court.

On March 23, 1967, Danny D. Fincham, nine years old, was severely injured when his right leg was crushed beneath the wheels of a railroad car and had to be amputated below the knee. The accident occurred in the Carolina Yard of the Norfolk Southern Railway Company in the city of Chesapeake. An action was brought against the railroad to recover damages for Danny's personal injuries. His father, Wood R. Fincham, brought a separate action to recover medical expenses he incurred on Danny's behalf.

The two actions were tried together pursuant to Code § 8-629. On December 1, 1969, the jury returned what was purported to be a verdict in the father's case in the amount of $17,000. The trial court later reduced this amount to $6,000.

At the time the jury found for the father, it had not reached a verdict in Danny's case. At the request of counsel for the parties, the trial court questioned the jury foreman on whether the jury had reached a unanimous opinion on the question of the railroad's liability to Danny. The jury foreman replied, in the presence of the other jurors, that they all agreed the railroad was liable to Danny, but were unable to agree on the amount of his damages. The trial court declared a mistrial in Danny's case, dismissed the jury, and continued the case generally to hear motions counsel desired to make.

Thereafter, the court ordered a new trial in Danny's case restricted solely to the issue of damages. It delayed entering a judgment on the father's verdict until Danny's trial on damages was had. At that trial, a verdict for $450,592 was rendered. On July 8, 1970, the court entered judgment in each case. We granted the railroad a writ of error to those judgments.

Although a number of questions are presented in these appeals, only four warrant our consideration. First, was there sufficient evidence to establish primary negligence on the part of the railroad proximately causing Danny's injury? Second, was Danny guilty of contributory negligence as a matter of law? Third, did the court err in ordering a new trial in Danny's case restricted solely to the issue of damages? Fourth, did the court err in entering judgment in the father's case?

Carolina Yard of the Norfolk Southern railroad is generally used for making up and breaking down trains. It extends about 5000 feet in a north-south direction and spreads out in width from tapered ends. The widest portion of the yard is at its center. There are two main line tracks on the east side and ten storage tracks in the yard as well as railroad shops and other structures.

The accident happened on track two, a storage track, at about 6:00 p.m. near the north end of the yard. On the whole, the storage tracks were "clogged" with cars. Two crews were shifting cars in the yard at the time of the accident. One was in the south end of the yard and the other in the north end. The south crew, composed of four men, had been at work most of the day. The north crew, composed of five men, had been on duty about 30 minutes before the accident.

Both crews were involved in the routine work of shifting cars to various storage tracks to make up trains. Generally, the cars are shifted into place by "bumping" or "kicking" them with the engine. The cars then roll along the tracks freely until they either come to rest voluntarily or until they strike another car on the track. A crew member operates the track switches and thereby determines where a car will be located. The crews were working independently of each other, but the north crew knew that the south crew was "kicking" cars onto the storage tracks. The engines in use at the time were equipped with radiophones, which made communication possible between the crews and between a crew and the yardmaster.

The evidence discloses that the yard was a dangerous place for persons to be. It was customary for trainmen who observed a child in the yard to report this information to the yard office. The yard office would then notify special officers employed by the railroad who would go into the yard to look for and remove the child.

On the day of the accident, Danny and his fourteen year old brother, Gregory, decided to run away from home. They set out to walk to their grandmother's home in Front Royal. When they came upon the railroad yard, they decided to "stop off and play." At about 4:00 p.m. B. E. Moore, a brakeman on the south crew, discovered two unidentified, small boys playing in the yard near the main line tracks. He started toward the boys and "hollered" at them, and they ran into some bushes near the main line tracks. Moore said he told Benjamin Gray, his conductor, he had seen two boys in the yard. Gray stated, however, that he did not recall being informed

of the boys' presence. If he had seen the boys, he said he would have reported it to the office so that special officers would look for them.

Danny and Gregory entered a small building located in the yard and played with a telephone. After this, they went deeper into the yard and climbed into a boxcar, where they stayed five or ten minutes. Upon leaving the boxcar, Danny saw a man with a flashlight looking in cars. According to Danny, this man warned him to leave the yard.

Soon after Danny was warned, Gregory noticed a car rolling slowly on one of the storage tracks and jumped on it for a ride. Danny did not get on the car. After Gregory got off the car, they saw the north crew's engine as it went by them on another track.

At about 5:45 p.m. B. R. Jacobs, a member of the north crew, saw Danny and his brother standing between storage tracks six and seven. When he first saw them, they were about 200 yards away. After the north crew shifted some cars, Jacobs told his conductor, Chester McClanahan, he had seen two boys.

McClanahan testified that he first saw the boys about 5:50 p.m. as he was standing with Jacobs at the switch on track six. When he first observed them one boy was between tracks five and six and the other was hanging on the side of a rolling boxcar his crew had just released. He said, "I took it for granted they were playing" but he took no action at that time although he was only 200 yards from the boys, within 200 feet of the radio telephone in the engine and 125 yards from a telephone in the yard.

A few minutes later, the north crew engine moved closer to Danny and Gregory. McClanahan, who was then on the engine, saw them between tracks five and six at the end of a boxcar "peeping" at the engine. The boys were only 12 or 13 feet from the engine. McClanahan yelled at Danny and Gregory, "Get out of the yard before you get killed or a leg cut off."

After the warning, Danny and Gregory disappeared from sight. They ran around the end of some cars and crawled under others. Between two and five minutes after they had been warned by McClanahan, he heard a scream. Soon after he heard the scream, Gregory appeared and asked a member of the north crew for help because his brother's leg had been cut off.

Members of the north crew went to Danny, who was found beneath a boxcar on track two. The conductor of the crew ordered

his engineer to call the south crew and tell them to stop "kicking" cars and to call an ambulance. At the time the accident occurred, the south crew was unaware that Danny and his brother were in the yard. It was stipulated that Danny was not injured by any operation or movement of cars under the control of the north crew.

There was testimony from members of both crews that adults as well as children had been seen in the yard on past occasions. One crew member said pedestrians of all ages were seen passing through the yard every day. The owners of business establishments adjacent to the yard also testified that they had frequently seen pedestrians in the yard.

Danny Fincham, at the time of the accident, was a trespasser on the railroad's property. The railroad argues that upon discovering Danny in the yard it was simply required not to injure him by wilful or wanton conduct. It relies on *Tiller* v. *Norfolk and Western*, 190 Va. 605, 58 S.E.2d 45 (1950), where this court said, "Ordinarily, a railroad company owes to a trespasser or bare licensee on its property the negative duty not to injure him wantonly or wilfully after having discovered his presence." 190 Va. at 610, 58 S.E.2d at 47. However, as the next paragraph points out "In Virginia, and in some other jurisdictions, this general rule is subject to the qualification that in order for a railroad company to incur liability to a trespasser it is not necessary that its employees should actually know of his danger or peril. It is enough if the employees have notice of what would cause a person, in the exercise of ordinary care, to be alerted to the danger. *After such notice they must exercise ordinary care to avoid injuring a person, even though he be a trespasser.*" [Emphasis added.] Thus, the duty owed a trespasser, whose presence is known or ought to be known, is one of ordinary care to avoid injury to him. It is not a duty to refrain from wanton or wilful conduct.

We should point out, however, that a railroad does not owe a trespasser the duty of prevision or preparation for his discovery. *Hawkins* v. *Beecham*, 168 Va. 553, 560, 191 S.E. 640, 643 (1937).

Since the degree of care owed to Danny was one of ordinary care, we are of the opinion the evidence in this case presented jury questions on the issues of negligence and proximate cause. Certainly, reasonable men could differ on the conclusions to be drawn from the evidence. It is true Danny was warned of the danger, but, in light of available alternatives, whether other affirmative action should have been taken was for the jury to decide.

■ We next consider whether Danny was guilty of contributory negligence as a matter of law. Danny, being between the ages of seven and fourteen, is presumed to be incapable of being negligent. The presumption prevails unless rebutted by sufficient proof to the contrary. *Morris* v. *Peyton*, 148 Va. 812, 821, 139 S.E. 500, 502-03 (1927). See also *Smith* v. *Kauffman, Adm'r.*, 212 Va. 181, 187, 183 S.E.2d 190, 195 (1971). Our review of the record shows that the question of Danny's negligence, if any, was one solely for the jury to decide.

■ We now consider the jury's failure to return a verdict in Danny's case and the verdict rendered in the father's case. As pointed out above, the trial judge, at the request of counsel, asked the jury foreman in the presence of all jurors if they had reached a unanimous opinion on the question of liability in the case of *Danny Fincham* v. *Norfolk Southern Railway*. The foreman replied that they had. Further, it was determined from the foreman that the jury's difficulty in arriving at a verdict arose only with regard to the amount of damages Danny should receive. This procedure was, to say the least, unusual.

In Danny's case the jury was instructed to return a general verdict. In order to arrive at such a verdict the jury had to agree on two issues, namely on whether the railroad was liable to Danny and, if so, the amount of damage which he had sustained. Unless the jury agreed on both issues there is no verdict. *Washington* v. *Calhoun*, 103 Ga. 675, 30 S.E. 434 (1898). See Burks Pleading and Practice § 321 (4th ed. 1952).

The colloquy between the court and the foreman of the jury indicates, at most, that the jurors may have agreed on one of the two questions which they had to resolve to arrive at a verdict in Danny's case. The exchange between the court and the jury foreman was not attended by the formalities normally associated with receiving a jury's verdict. There was no verdict in writing and the other jurors, while present, were not polled to ascertain if they agreed with this statement by the foreman.

We find, therefore, that no verdict was rendered in Danny's case and that the trial court erred in entering summary judgment for him and empaneling a jury to try only the issue of damages. This action by the trial court was clearly a violation of Rule 3:20,[1] which pro-

---

[1] For text of Rule 3:20 at the time of trial see 1971 Cumm. Supp. to Vol. 2 of Code. Former Rule 3:20 was substantially revised on March 1, 1972. The revised rule is now Rule 3:18.

vided in part ". . . Summary judgment shall not be entered if the amount of damage or any other material fact is genuinely in dispute."

The father's cause of action for medical and incidental expenses was a derivative action. The trial court instructed the jury that it must return a verdict for Danny before his father was entitled to recover. Since there was no verdict in Danny's case there could be none in the father's case.

*Reversed and remanded.*

I'ANSON and COCHRAN, JJ., concur in the result.

SNEAD, C.J., and CARRICO, J., concurring in part and dissenting in part.

We agree that the questions of negligence, contributory negligence and proximate cause were for the jury to decide. But we cannot agree that the issue of liability should be re-litigated. It is true that no verdict was rendered in Danny's case, but that is not the question. It is not true, as the majority concludes, that the jury was required to return a verdict for Danny before they could reach a verdict for the father. The instruction merely commanded a verdict for the father if one was rendered for Danny. Under the facts in these cases, the father could recover if, and only if, the railroad was liable to Danny. The critical question, therefore, is whether the railroad had been found *liable* to Danny. We believe it had.

Although the colloquy between the judge and jury foreman was unusual, it was had at the request of counsel and ought not to be ignored. Until the colloquy there was no way of knowing on what basis the jury found a verdict for the father. The colloquy, however, eliminated any questions and made it abundantly clear that the jury had found the railroad was liable to Danny. Hence, the father was entitled to recover for Danny's medical expenses and judgment was properly entered on the reduced verdict in his favor.

Further, since these cases were tried together, all the parties were before the court, the issues of liability were identical, and the jury made it clear that they had determined the railroad was liable, we are of opinion that the railroad was thereafter precluded from denying its liability to Danny. The railroad has had its day in court and should not be permitted to re-litigate the issue of its liability. Hence, we think that the trial court properly limited the new trial in Danny's case to the question of damages.

We would affirm the judgments of the trial court.