## Richmond

## NORFOLK AND PORTSMOUTH BELT LINE RAILROAD COMPANY

v.

## NUNIOR DAVID BARKER, AN INFANT, ETC., ET AL.

March 6, 1981.

Record No. 781551.

Present: Carrico, C.J., Harrison, Cochran, Poff,
Compton and Thompson, JJ.*

---

\* Mr. Chief Justice I'Anson presided at the oral argument of this case but retired January 31, 1981.

John E. Clarkson (James C. Howell, Willcox, Savage, Lawrence, Dickson & Spindle, P.C., on briefs), for appellant.

John F. Rixey (Roger S. Fraley; Rixey and Heilig, on brief), for appellees.

POFF, J., delivered the opinion of the Court.

Nunior David Barker (David), an infant suing by his father and next friend, Ornan E. Barker, and Ornan E. Barker, in proper person,[1] filed motions for judgment against Norfolk and Portsmouth Belt Line Railroad seeking damages resulting from injuries David sustained when his foot was crushed beneath the wheel of a railroad car. The actions were consolidated for trial, and a jury returned verdicts for the railroad. Sustaining the plaintiffs' motions, the trial court set the verdicts aside on the ground that one of the jurors had visited the scene of the accident and had conveyed certain information to other jurors which influenced their decisions. At a second trial, the jury awarded David and his father verdicts of $90,000 and $50,000, respectively. The trial court overruled the railroad's motion for judgment *non obstante veredicto* and entered final judgments for the plaintiffs.

The accident occurred about 5:30 p.m. on October 21, 1975 at the Berkley Avenue railroad crossing in the City of Chesapeake. Two parallel tracks intersect the street at right angles. A train consisting of the engine and 40 to 45 cars was travelling on the eastbound track on a trip from Sewells Point to Berkley yard. The crew received a "stop and stay" signal and brought the train to a halt with the engine near the crossing. Engineer David Myers and brakeman G. A. Jones dismounted and raised the safety gates to permit automobile traffic to cross the tracks. The train remained in its "holding position" and Myers and Jones continued to operate the gates manually for approximately 20 minutes.

David, age 10, and his friend Daniel Jarvis, had been "hunting for bicycle parts" in a city dump opposite the westbound track. They testified that, as the train approached, they laid their bicycles aside and walked onto the westbound track. When the train stopped, David sat down on the outer rail and Daniel on the ties connecting the rails at a distance of 11 feet from the engine. They remained seated for "at least fifteen or twenty minutes" and watched the men as they raised

---

[1] The Court was advised by counsel at bar that Ornan E. Barker died during the pendency of this appeal. The appeal will not abate, and we will "retain jurisdiction and enter judgment . . . as if such event had not occurred." Code § 8.01-20.

and lowered the gates. When the crew received the signal to proceed, Myers and Jones remounted the engine. David testified that "the colored man said, 'Don't you-all mess around the train,' and we said, 'All right.' " Daniel confirmed his testimony.

None of the four crew members remembered speaking to the boys or seeing them on any part of the railroad right-of-way. Myers said he saw them at a distance of "approximately thirty-five to forty feet from where my engine was." Brakeman Manley Roache, who had remained on the train with conductor Robert Carpenter, saw them on the shoulder of the street "about ten foot" outside the gate. As the train started to move again, Carpenter observed the boys standing beside their bicycles "approximately 10 feet" from the westbound track, and Jones saw them "sitting on their bicycles . . . about five feet on the other side of the westbound track." Once the train was underway, Jones "looked a couple of cars back and they were still sitting there and I had to watch the signal . . . so I had no reason to believe . . . that they would get off their bicycles and go over."

Jones was the only crew member who looked to the rear. He agreed that "[m]aybe from two to four" cars could have been seen without sticking his head out the window and that more would have been visible as the engine entered the right curve. Myers testified that, when the train is travelling on a straight track, "[a] man has to lean out the window to look to see what is on the rear of the train and you are violating a rule if you do that." Marvin Zadnichek, testifying as an expert witness for the plaintiffs, said that "someone looking on that right-hand curve from his perfect position in the cab of that engine could have seen the last car come across the crossing." He didn't know the distance involved but estimated that it was "[m]aybe twenty-five car lengths." Another witness called by the plaintiffs, F. V. Ewell, an experienced conductor familiar with the Berkley crossing, the curve, and the "bushes growing alongside the track", testified that from the point on the curve where the view of the crossing was lost, a person in the engine looking back to the crossing could see "between twenty-eight and thirty car lengths" between the two points.

In compliance with a "red over yellow" signal, the engineer restricted the speed of the train to six miles per hour. David testified that he "waited for the engine to get out of sight" around the curve and "jumped on the train the first time." Daniel's testimony was to the same effect. As a coal car, positioned near the middle of the train, reached "the left-hand side" of the intersection, David grabbed the ladder and "rode it across the intersection and jumped off." He then ran back across the intersection. When the coal car next to the

last arrived, he "grabbed ahold of one of the bars and it had grease on it and I slipped and right there my foot went under there." Daniel said that David slipped when he was "about the middle of the intersection."

David acknowledged that he had been jumping on trains since he was "around eight or nine years old", that his father and school friends had warned him about the practice, and that he knew it was dangerous and "you could get hurt by riding a train", but that he was "willing to take that chance".

■ We consider first whether the jury's finding that the railroad was guilty of primary negligence is supported by the record. No error was assigned to the jury instructions, and the definition of negligence contained in those instructions is the law of this case. *Bostic* v. *Whited*, 198 Va. 237, 239, 93 S.E.2d 334, 335 (1956).

■ The jury was instructed that the railroad owed trespassers the duty of ordinary care; that "one who sees an infant child at or near a place of danger is on notice that an infant . . . might, through his thoughtlessness, expose himself in some way to danger of injury"; and that if the jury believed that the railroad "failed to take reasonable action under the circumstances . . . to prevent the infant plaintiff from hopping a ride on its train and that such failure . . . was a proximate cause of the accident . . . and that the infant plaintiff was not guilty of negligence, then you shall find your verdicts in favor of the plaintiffs."

Considering the factual context, we question the propriety of the rule fashioned by these instructions. The area near a train which is moving or about to move is, potentially, a dangerous place. It is always possible that a child in such a place may expose himself to the danger. And the law requires a person who perceives the possibility to assume that the child may, "through his thoughtlessness", commit some careless act or omission. But the law does not require him to anticipate that the child will expose himself to a known danger intentionally. Since David's own testimony shows that he acted intentionally with full knowledge that his act was perilous, the instruction was inapposite.

■ Moreover, by hopping on the train, David committed a trespass and a class 4 misdemeanor. Code § 18.2-161. The jury was told that the duty owed a trespasser was that of ordinary care and that the duty the railroad owed David was the duty "to take reasonable action under the circumstances . . . to prevent [him] from hopping a ride on its train." But, unless a train is to be classified an attractive nuisance along its entire track system (a proposition never urged here), the duty a railroad owes a trespasser does not include

an obligation to prevent the trespass which triggers the danger. *See Hawkins* v. *Beecham,* 168 Va. 553, 560, 191 S.E. 640, 643 (1937); *Brooks* v. *Norfolk & Western Railway Company,* 45 Ohio St. 2d 34, 340 N.E.2d 392 (1976). "We have been referred to no case where a court has gone so far as to require a railroad company to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them." *Scibelli* v. *Pennsylvania R.R. Co.,* 379 Pa. 282, 289, 108 A.2d 348, 352 (1954); *accord, Union Ry. Co.* v. *Williams,* 187 F.2d 489, 493 (6th Cir. 1951). Hence, the instruction imposed a duty upon the railroad greater than the duty the law exacts.

■ Yet, as we have said, the instructions are the law of this case. Necessarily underlying the jury's verdicts was a finding that the railroad failed to take reasonable action to prevent David from doing what he did. The plaintiffs argued that, if the railroad had posted a crewman on a car at or near the rear of the train throughout the trip from Sewells Point to Berkley yard, his presence there would have deterred David from jumping on the train. Alternatively, they contended that, once the boys were seen in a place of potential danger, the railroad should have stationed a crewman as a guard at the crossing with instructions to catch the rear car as it reached the intersection. The jury could have believed that failure to take such action was a breach of the railroad's duty as that duty was defined in the instructions and that such breach was a proximate cause of the accident. The railroad asks us to hold otherwise as a matter of law. Under the law of the case, we cannot.

■ We consider now whether, as the railroad contends, David was guilty of contributory negligence. The rules are well settled.

"The standard of conduct to which a child must conform for his own protection is that of a reasonable person of like age, intelligence, and experience under like circumstances." *Restatement (Second) of Torts* § 464(2) (1965). *See Seaboard & R. Co.* v. *Hickey,* 102 Va. 394, 397, 46 S.E. 392, 393 (1904). "Ordinarily, a less degree of care is required of an infant than an adult, but his responsibility is always to be measured according to his maturity and capacity, and determined by the circumstances of the case as shown by the evidence. (Citations omitted)." *Va.-Car. Ry. Co.* v. *Clawson,* 111 Va. 313, 316, 68 S.E. 1003, 1004-05 (1910). *See Miles* v. *Receivers,* 17 F. Cas. 285, 287 (E.D.Va. 1883), quoting *Railroad Co.* v. *Gladmon,* 82 U.S. (15 Wall.) 401 (1872). In Virginia, "the law presumes a child between the ages of seven and fourteen to be incapable of committing acts of negligence, and . . . the burden is on

the opposite party to overcome this presumption, unless such capacity is disclosed by plaintiff's own evidence." *Norfolk Southern Ry. Co.* v. *Wood,* 182 Va. 30, 35, 28 S.E.2d 15, 17 (1943).

These rules were fully explained in the instructions granted in this case. The jurors were then told that if they believed that David "was capable of understanding and appreciating the nature of danger and peril associated with his conduct" and that he failed "to exercise a degree of care for his own safety commensurate with that of children of the same [capacity]", such failure "would constitute negligence".

■ The evidence shows conclusively that David's conduct was a contributing cause of his injury. But the question is whether his conduct constituted "contributory negligence" as that term is defined in the law of torts. Under that law as detailed in the instructions, the answer depends upon whether, in light of his age, intelligence, and experience, David had the capacity to understand the danger his conduct entailed. Capacity in that context is a jury question, and a jury's finding is binding unless it is contrary to the evidence or without evidence to support it.

■ From David's own testimony, it appears that he was experienced in the practice of jumping on trains; the ten-year old boy had been doing so since he was eight or nine. Based upon his experience and the warnings he had received, he recognized that "you could get hurt by riding a train." He knew the danger involved; he said so. Yet, the jury concluded that he did not have the capacity to know.

We are of opinion that the jury's conclusion was contrary to all the evidence; that David had the capacity to know and, in fact, did know that his conduct was dangerous; and that his conduct violated the standard of care required of a child of comparable capacity. We hold, therefore, that David was guilty of contributory negligence as a matter of law.

The judgments will be reversed and final judgments for the railroad will be entered here.

*Reversed and final judgments.*

COMPTON, J., dissenting in part.

Contributory negligence invariably is a factual question to be decided by a jury. This is especially true when the plaintiff, as here, is armed with a presumption of fact that he is incapable of committing acts of negligence. That presumption prevails until overcome by *sufficient* proof to the contrary. *Norfolk Southern Ry* v. *Fincham,* 213 Va. 122, 127, 189 S.E.2d 380, 384 (1972). The jury has

found that defendant failed sufficiently to rebut the presumption. The trial judge has ratified that conclusion. Under this evidence, I think the judge and jury were right.

The record shows that this ten-year-old boy, aware that "trains were dangerous" and that "you could get hurt by riding a train," nevertheless was willing to take a "chance" in order "to be like the other boys" he had observed climbing on and off moving railway cars. This evidence, in my view, demonstrates the precise kind of childish conduct born of an immature impulse that, when combined with the presumption, creates an issue of disputed fact on the question of contributory negligence.

The majority dwells on the fact that the child said he knew of the danger. That such an utterance was made is not significant; scarcely any child over seven years of age, regardless of his intelligence quotient, could be expected to say that the activity of train-jumping is safe.

The crucial inquiry, I submit, in determining if the presumption against negligence has been overcome, is whether this child, considering his knowledge of the danger, had the capacity of other similarly situated children to exercise sufficient discretion, self-control and restraint to withstand the childish urge to take a "chance" in order "to be like the other boys." Such an appraisal cannot accurately be made by focusing only upon the printed appellate record of what the child has said. He must be seen and observed on the witness stand so that his capacity and intelligence can be assessed based, not just upon what he says, but upon how he says it. Astuteness, on the one hand, or thoughtlessness, on the other, must be judged by demeanor as well as the spoken word. The jury and trial judge had that opportunity for personal evaluation; this Court did not.

Thus, I would affirm the judgment of the trial court.